714

[Nos. 40984-4-II; 41004-4-II;    Division Two.    October 30, 2012.]
41026-5-II.

THE STATE OF WASHINGTON, *Respondent*, v. RANDALL MARQUISE EMBRY, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. BRYANT DESHEAN MORGAN, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. ANDRE TERRELL PARKER, *Appellant*.

716

720

*Sheri L. Arnold, Barbara L. Corey*, and *Lise Ellner*, for appellants.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Kimberley A. DeMarco, Deputy*, for respondent.

¶1  JOHANSON, A.C.J. — A jury convicted Randall Marquise Embry, Bryant Deshean Morgan, and Andre Terrell Parker of attempted first degree murder, with firearm sentencing enhancements, and first degree unlawful possession of a firearm. The jury also convicted Embry of conspiracy to commit first degree murder. On appeal, they raise various claims related to (1) joinder and consolidation, (2) admission of gang-related evidence, (3) improper witness testimony and conduct, (4) insufficient evidence, (5) prosecutorial mis-

conduct, (6) improper jury instructions, (7) ineffective assistance of counsel, (8) sentencing errors, and (9) cumulative error. We reverse Parker's and Morgan's convictions for first degree unlawful firearm possession for insufficient evidence, but we affirm all other counts.

## FACTS

¶2 In the early morning of New Year's Day 2009, at the 54th Street Bar and Grill in Tacoma, a fight broke out between Andre Parker and Michael Nelson, Tyrick Clark's friend. Clark and another friend, "Cornelius," observed the fight; and, according to Clark, Parker swung at Cornelius. Clark then retaliated, hitting Parker in the mouth. Parker was a member of the Hilltop Crips, a Tacoma street gang; Clark was a member of the Young Gangster Crips (YGC).

¶3 On February 23, 2009, Clark and Nicole Crimmins went to McCabe's, a Tacoma nightclub. Clark saw Parker at McCabe's that night, and although he did not interact with Parker that night, Clark's impression was that the two had not resolved their issues stemming from their New Year's morning fight.[1] Curtis Hudson, a McCabe's patron, confirmed that he understood Parker and Clark had a "beef" with one another stemming from their earlier fight. 6 Verbatim Report of Proceedings (VRP) at 908.

¶4 Embry and Morgan, two Hoover Crips gang members, also visited McCabe's that night. Clark did not know Embry or Morgan. While at McCabe's, Clark visited with an acquaintance about the New Year's morning fight with Parker, and Embry briefly approached and tried to interject himself into Clark's conversation. Later that night, as he descended a McCabe's stairwell, Clark inadvertently kicked Embry's shoe as Embry visited on the stairs with Morgan.

¶5 Just before closing, Clark and Crimmins left McCabe's and walked toward their vehicle, which was parked along

---

[1] Clark's testimony is ambiguous. He said, "[T]he impression I was under the only person I was still mad at was Mr.—was [Parker]." 4 Verbatim Report of Proceedings at 602.

an adjacent street. As they neared their vehicle, a man wearing a hooded sweatshirt—later identified by Crimmins and Clark as Embry—approached them from behind another car parked along the same street. As Clark and Crimmins were about to pass Embry, Embry pulled out a gun and shot Clark several times. As Clark fell to the ground, Embry went to a nearby car. Embry entered the car's backseat. Crimmins followed Embry, called 911, and relayed the car's description and license plate number to the dispatcher.

¶6 As Embry departed, off-duty Tacoma police officers Scott Stanley and David Fischer, both moonlighting at McCabe's, arrived at the scene.[2] An emotional Crimmins initially told the officers that the shooter got into a white Chevrolet Caprice with license plate number 698-YNT. After she calmed down, she described the car as a "silver Ford Escort-type vehicle." 2 VRP at 268.

¶7 Other witnesses also heard the gunshots. Telon Walker, Clark's cousin, was standing outside McCabe's when he heard the gunshots. He turned toward the gunshots, saw Crimmins and a body on the ground, and ran in that direction. Walker witnessed a 2006 to 2008 four-door "grayish, light mauve, tan color" Chevrolet Impala drive away from the scene. 5 VRP at 768. Before the car departed, he saw two men get into the car: one wearing a red hooded sweatshirt climbed into the rear, passenger side, and one wearing a dark hooded sweatshirt climbed into the rear, driver side. Walker added that earlier he had seen Morgan wearing the red hooded sweatshirt at McCabe's. Following the gunshots, Hudson witnessed a man in a "red sweatshirt, hoody sweatshirt" running away from the shooting. 6 VRP at 913. He recognized the red sweatshirt as that which Morgan wore that evening. Manuel Hernandez also turned toward the gunfire immediately after hearing shots. He saw a man

---

[2] Officer Stanley estimated that it took just 15 seconds, from the time he heard gunfire, to arrive at the shooting scene.

with a "five-point star" tattoo on his neck,[3] Embry, running from the shooting scene with another man. 6 VRP at 974. Embry carried a gun in his right hand.

## SECURITY VIDEO FOOTAGE

¶8  McCabe's surveillance cameras partially captured the events in and around McCabe's. At 11:36 p.m. Embry entered McCabe's. Shortly after midnight, Morgan and Parker entered together. Parker wore a gray, blue, and white jacket with a hood; blue jeans; and white shoes. Morgan wore a red hooded sweatshirt. Embry wore a black and white hooded sweatshirt and a Houston Astros baseball cap. Video footage depicts Parker, Embry, and Morgan interacting with each other, as well as with others. Between 1:48 and 1:52 a.m., the three left McCabe's and visited in front of McCabe's. Clark exited the club at 1:51 a.m.

¶9  Embry and Morgan then jogged out of the picture toward Clark's parked van. Parker followed, walking in the same general direction. Then, at 1:53 a.m., Clark and Crimmins walked together in that same direction toward Clark's vehicle. Almost two minutes after Clark and Crimmins left, walking toward their vehicle, everyone in front of McCabe's turned their heads toward the direction that Parker, Embry, Morgan, Crimmins, and Clark had all gone. The cameras did not capture the shooting.

## STOLEN VEHICLE REPORT

¶10  Within seconds of the shooting, Crimmins had provided officers the license plate number on the getaway car, 698-YNT; and, authorities alerted officers to watch for this vehicle. Less than two hours after the shooting, Tacoma Police Officer Mikael Johnson received a stolen vehicle report filed by Parker for a rented, dark gray or silver 2009

---

[3] Hernandez described the tattoo as a "[f]ive-point star with 'H' in it." 6 VRP at 975. Tacoma Police Detective John Ringer testified that both Hilltop Crips and Hoover Crips wear this symbol, described as the Houston Astros logo.

Chevy Impala with license plate number 648-YNT. Officer Johnson noted that this vehicle appeared "similar in description and license plate number to a vehicle from the McCabe shooting." 5 VRP at 851.

¶11 Parker told Officer Johnson that he had parked the rented vehicle in front of his girl friend's apartment at 1:15 a.m. and left it running while he went upstairs. When he returned to the parking lot, the vehicle was gone. Parker claimed he had not reported it stolen until after 3:00 a.m. because it was a rental, and he needed to contact the rental company to obtain the vehicle's license plate number and VIN (vehicle identification number).

¶12 Parker's story, however, differed from that of his girl friend, Christine Borland, who testified that in the early morning on February 24, while she slept at her apartment, Parker called and asked her to pick him up "from Chevron or McDonald's off [State Route] 512." 6 VRP at 1036. Borland picked up Parker, and, while returning to the apartment, Parker told her "[s]omething bad happened" at McCabe's and that someone stole his car. 6 VRP at 1041. After returning to Borland's apartment, Borland went to sleep and Parker reported his rental car stolen.

¶13 Borland testified that she had initially lied during the investigation when she said one of Parker's friends drove him back to Borland's apartment after McCabe's. But feeling guilty about lying to detectives, Borland corrected her story to reflect that she had "picked him up off 512." 6 VRP at 1060. According to Detective John Ringer, though, even Borland's testimony differed from what she told him during an investigative interview. Borland told Detective Ringer during an interview that Parker told her to tell police that he had been at her apartment at 1:00 a.m. and that the car was stolen there. Detective Ringer confirmed, however, that Borland corrected her story to reflect that Parker requested she pick him up at McDonald's off State Route 512. On March 10, 2009, Kent police located Parker's rented four-door Chevrolet Impala, license number 648-YNT, in the Green River.

PROCEDURE

¶14 The State charged Embry, Parker, and Morgan with attempted first degree murder[4] with a firearm sentencing enhancement,[5] as well as unlawful possession of a firearm.[6] It also charged Embry with conspiracy to commit first degree murder.[7]

¶15 Before trial, the defendants sought to exclude evidence of their gang affiliations. In an offer of proof, the State asserted that the defendants knew each other and had associated for some time. The State asserted that the gang evidence linked Embry, Parker, and Morgan because their gangs were known to associate and work in concert. Specifically, the State offered that Parker, a Hilltop Crip, was still upset about the New Year's morning fight between YGC and Hilltop Crips. The State argued that its evidence would show that Parker was still angry at Clark and sought members of King County's Hoover Crips, an allied gang, to retaliate against Clark, a YGC. The State also asserted that the video footage would show the defendants associating at McCabe's and in front of the club before Embry and Morgan ran ahead of Clark in the direction of the shooting, and that Embry and Morgan had to run ahead because Embry had to retrieve the gun from Parker's car.[8] The offer of proof also detailed that Parker reported his car stolen just hours after the shooting. The State reasoned that the gang evidence was the "glue that holds [the State's theory] together." 1 VRP at 39.

¶16 The trial court initially determined that although the State's offer connected the defendants, their gang activ-

---

[4] RCW 9A.28.020; RCW 9A.32.030(1)(a).

[5] RCW 9.94A.533(3).

[6] RCW 9.41.040(1)(a).

[7] RCW 9A.28.040; RCW 9A.32.030(1)(a).

[8] Bouncers outside McCabe's pat down patrons for weapons upon entry.

ity, and the crime, the likelihood of undue prejudice out-weighed its probative value. The State immediately moved for reconsideration. The State offered photographs from the defendants' MySpace pages, picturing them together among others—Hilltop Crips and Hoover Crips—flashing their gang signs. After reviewing these photographs, the trial court found increased probative value and reconsidered its ruling, determining that "the photographs I think tip the matters considerably." 1 VRP at 131. The court then allowed evidence of the defendants' gang affiliation under ER 404(b).

¶17 The trial court also heard arguments relating to how the State would present the video footage, as the State intended for Detective Ringer to play the video to the jury and narrate. The court determined that Detective Ringer could narrate the footage but that "testimony should be limited to who the players are" in what he observed. 1 VRP at 123. The court barred him from rendering opinions speculating what people are pictured doing. The court also allowed Detective Ringer to testify as a gang expert for purposes of explaining gang culture, though he could testify only as a "fact witness" regarding his observations on the video. 8 VRP at 1332.

¶18 At trial, Detective Ringer testified as both an expert on gang culture and as a fact witness narrating the video; and, he detailed his investigation relating to this incident. He recalled a meeting with Morgan at the Tacoma police station in which he played Morgan the surveillance video. Detective Ringer testified that after watching the video, Morgan stated, "That is what it is right there . . . . Can't do anything but go to trial with that." 7 VRP at 1261. Ringer testified that Morgan "made it clear that the code he was raised with would not allow him to cooperate or testify against others." 7 VRP at 1261.

¶19 Embry was the only defendant to testify at trial. He testified that when Detective Ringer questioned him about the shooting at McCabe's, he responded, "I don't know

nothing, I didn't do nothing, and I wouldn't tell you if I did." 9 VRP at 1529.

¶20 Then, at one point during closing argument the State said, "Law enforcement did a great job investigating this case." 10 VRP at 1613. The State also discussed gang culture:

> Code of the street is garbage. Code of the street: Don't cooperate with the police. Shoot people. Kill people. In this scenario, don't talk to the police about it.
>
> Well, any criminal, of course, committing an act won't talk to the police. That makes sense because they are going to jail. They're going to be held accountable.

10 VRP at 1598.

¶21 The jury found each of the defendants guilty on all charges and answered affirmatively on the firearm enhancements. Embry, Parker, and Morgan timely appeal.

## ANALYSIS

### I. Joinder and Consolidation

¶22 In his statement of additional grounds for review (SAG)[9] Embry asserts that the trial court abused its discretion when it joined his charges and consolidated his case for trial with those of Morgan and Parker. CrR 4.3(b) provides that a trial court may join multiple defendants in a single charging document when each is charged with the same offense or with offenses so closely connected that it would be difficult to separate proof of one offense from proof of others. CrR 4.3.1(c) provides that a court may consolidate multiple informations for trial if, under CrR 4.3, the defendants could have been joined in a single information.

¶23 We review de novo questions of whether a trial court properly joined two or more offenses. *State v. Bryant,*

---

[9] RAP 10.10.

89 Wn. App. 857, 864, 950 P.2d 1004 (1998), *review denied*, 137 Wn.2d 1017 (1999). A defendant must demonstrate that a joint trial was so manifestly prejudicial as to outweigh the concern for judicial economy. *State v. Philips*, 108 Wn.2d 627, 640, 741 P.2d 24 (1987). To meet this burden, the defendant must point to specific prejudice. *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983).

¶24 Embry appears to raise this issue for the first time on appeal, so he must demonstrate that the joint trial was so manifestly prejudicial that it outweighed the concern for judicial economy. *See Philips*, 108 Wn.2d at 640. Embry fails to make any argument as to why a joint trial was prejudicial. He cannot demonstrate that he suffered manifest prejudice as a result of the court's joinder because two eyewitnesses identified him as the shooter and another witness saw him fleeing the scene of the shooting with a gun in his hand. This evidence was admissible against Embry whether or not he was jointly tried with Morgan and Parker. Given this strong evidence against Embry, he cannot show he suffered manifest prejudice as a result of the joint trial.

## II. ER 404(b) Gang Evidence

¶25 Embry, Morgan, and Parker assert that the trial court abused its discretion when it admitted evidence of their gang affiliations under ER 404(b).[10] We disagree.

### A. Standard of Review

¶26 We review ER 404(b) evidentiary rulings for abuse of discretion. *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised

---

[10] Morgan also asserts that admission of this evidence violates his First Amendment rights, but because he does not brief this issue we do not consider it. RAP 10.3(a)(6).

on untenable grounds or for untenable reasons. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). A trial court abuses its discretion when it relies on unsupported facts, takes a view that no reasonable person would take, applies an incorrect legal standard, or bases its ruling on an erroneous legal view. *Lord*, 161 Wn.2d at 284.

¶27 Courts consider evidence of gang affiliation prejudicial. *State v. Asaeli*, 150 Wn. App. 543, 579, 208 P.3d 1136, *review denied*, 167 Wn.2d 1001 (2009) (noting "the inflammatory nature of gang evidence generally"). Therefore, there must be a nexus between the crime and the gang before the trial court may find the evidence relevant. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009), *review denied*, 168 Wn.2d 1004 (2010). Courts may admit gang affiliation evidence to establish the motive for a crime or to show that defendants acted in concert.[11] *Scott*, 151 Wn. App. at 527. Gang evidence falls within the scope of ER 404(b). *Yarbrough*, 151 Wn. App. at 81. A trial court may admit gang evidence offered for proof of motive, intent, or identity. *Yarbrough*, 151 Wn. App. at 81. But before the trial court may admit such evidence, it must (1) find by a preponderance of the evidence that misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. *Yarbrough*, 151 Wn. App. at 81-82.

## B. Analysis

¶28 Here, Embry asserts that the State's gang evidence failed to demonstrate his intent, plan, preparation, or motive; therefore, he argues, it lacked probative value. Morgan argues that any alleged gang affiliation lacked a

---

[11] Evidence of concerted action is a basis for finding multiple individuals guilty for taking part in a single crime. *Scott*, 151 Wn. App. at 527 n.6; *see, e.g., State v. Lane*, 125 Wn.2d 825, 835, 889 P.2d 929 (1995) (three defendants guilty of murder though only one defendant shot the victim).

nexus to the shooting. The requisite nexus did exist between the gang affiliation and the shooting, creating the necessary probative value; and, the trial court did not abuse its discretion after properly applying the ER 404(b) test.

¶29 In its offer of proof, the State asserted that it would present (1) photographic evidence showing Embry, Morgan, and Parker flashing gang signs; (2) witness statements that the defendants were active gang members; and (3) evidence of the friendly relationship between the Hoover and Hilltop Crips. Relying on the State's offer of proof, the trial court applied the four-part *Yarbrough* test to determine whether to admit the evidence of gang affiliation under ER 404(b).

¶30 The State's offer of proof claimed that gang evidence would link Embry, Parker, and Morgan because their gangs worked in concert; specifically, the State offered that Parker, a Hilltop Crip, remained angry with Clark, a YGC, about the New Year's morning fight, which involved their gangs. The State asserted that its evidence would show that Parker still held animosity toward Clark, so he recruited Embry and Morgan—Hoover Crips, an allied gang—to retaliate against Clark. The State also asserted that in gang culture, seemingly minor altercations can quickly escalate to serious violence.

¶31 First, the trial court found by a preponderance of the evidence that the defendants belonged to gangs. The trial court found "some connection between these gentlemen and supposed gang activities and potentially with themselves as result of other activities." 1 VRP at 49. This determination satisfies the first part of the *Yarbrough* test. *See Yarbrough*, 151 Wn. App. at 81-82.

¶32 Second, the trial court identified the purpose for which the gang evidence would be introduced: "I think there is a reason to consider the admission of the evidence, and that is for motive, intent and certainly plan or preparation." 1 VRP at 49. This determination satisfies the second part of the *Yarbrough* test. *See Yarbrough*, 151 Wn. App. at 82.

¶33 Third, the court had to determine that the evidence was relevant to prove an element of the crimes charged. It also had to find a nexus between gang activity, the crime, and gang members Embry, Parker, and Morgan. *See Scott,* 151 Wn. App. at 526. The court found that requisite nexus and determined that the gang evidence was relevant to prove an element of Embry, Parker, and Morgan's charges:

> [W]hile there may not be a direct connection or loyalty or allegiance between the Hoover gang or Hilltop Crips, I think the inference here is there was close enough of [a] connection that would encourage, at the request of Mr. Parker, two known associates to commit allegedly a significant assault upon the victim in this case.

1 VRP at 134. To demonstrate that Embry committed conspiracy to commit first degree murder, the State had to prove that he "agreed with one or more persons to engage in or cause the performance of conduct constituting [attempted first degree murder]." Clerk's Papers (CP) (Embry) at 192. To prove that Morgan and Parker acted as accomplices to commit attempted first degree murder, the State had to prove that they "solicit[ed], command[ed], encourage[d], or request[ed] another person to commit" the attempted first degree murder, or "aid[ed] or agree[d] to aid another person in planning or committing the crime." CP (Embry) at 172. And the State could prove that Parker and Morgan provided Embry "assistance[,] whether given by words, acts, encouragement, support, or presence." CP (Embry) at 172. Accordingly, the trial court satisfied the third part of the *Yarbrough* test. *See Yarbrough,* 151 Wn. App. at 82.

¶34 Fourth, the trial court weighed the probative value of the gang evidence against its potential prejudicial effect, initially noting that "the difficulty is in the probative value of this particular evidence in the context of this case." 1 VRP at 49. The trial court expressed the difficulty in finding probative value:

While there certainly may be some connection here between the gang activity and this crime, it's very scant showing. And it's hard to say that [the] jury's going to consider the facts of this case based upon the testimony presented when confronted with testimony that these are gang members. And I think because of that, I can't find probative value of why the State is requesting the evidence in this case to outweigh the extreme prejudicial effect.

1 VRP at 50.

¶35 The trial court further explained its hesitancy to admit gang evidence:

I think the infusion of the gang—without more, without saying that the incident at [54th Street Bar and Grill] involved all three [codefendants], that it was a known battle over drug turf or economic related offenses, something along those lines. I think beyond that is stretching the admissibility of gang in a case where there may be gang involvement by three defendants beyond what's intended by the current case law.

1 VRP at 51.

¶36 The State immediately moved for reconsideration and offered MySpace photos of Embry, Parker, and Morgan together flashing gang signs. The trial court reviewed this offer and stated that "the photographs I think tip the matters considerably." 1 VRP at 131. "[T]hey show what appears to be alliance between the three defendants that predated the crime in question." 1 VRP at 132. The trial court added:

[T]he issue of the alliance and gang affiliation I think is important in a case such as this, where, if the jury doesn't know that, deciding this case in a total vacuum without any rational understanding of why there would be this potentially deadly assault upon a victim in this case.

1 VRP at 132.

¶37 The trial court returned to the fourth part of the *Yarbrough* test. It reversed its initial determination: "I think [the photos] tip the balancing in favor of admissibility

of the evidence, despite the substantial prejudice that there still may be there for the defendants." 1 VRP at 134. Accordingly, after performing this balancing test, weighing the probative value of the gang evidence against the potential for undue prejudice, the trial court satisfied the fourth part of the *Yarbrough* test.[12] *See Yarbrough*, 151 Wn. App. at 82.

¶38 Additionally, the *Yarbrough* case supports the trial court's admission of ER 404(b) gang evidence here. In *Yarbrough*, we held that the trial court properly allowed gang evidence because Yarbrough's mental state and intent to cause great bodily harm to the victim were relevant to his first degree assault charge. *Yarbrough*, 151 Wn. App. at 86. The State presented evidence of Yarbrough's gang affiliation and his perception that the victim associated with a rival gang, and information regarding a previous altercation between the two gangs, which helped the jury to better understand his mental state and intent regarding his assault charge against the eventual victim. *Yarbrough*, 151 Wn. App. at 87. The present matter is analogous to *Yarbrough*, as there we held that the trial court properly admitted gang evidence under ER 404(b) to show the defendant's mental state and intent to commit the crime charged. Here the State presented evidence of the defendants' gang affiliation, the victim's affiliation with a different gang, and a previous altercation between members of the victim's and defendants' gangs. As in *Yarbrough*, the trial court here found that the gang evidence was probative in proving the elements of the charged crime. Finding no manifest abuse of discretion such that no reasonable trial court would have ruled as the trial court did, we affirm the trial court's ER 404(b) ruling.[13] *Yarbrough*, 151 Wn. App. at 81.

---

[12] The court also admitted the evidence under res gestae.

[13] The dissent compares this matter to *Yarbrough*, 151 Wn. App. 66; *State v. Campbell*, 78 Wn. App. 813, 901 P.2d 1050 (1995); *Lane*, 125 Wn.2d 825; and *State v. Boot*, 89 Wn. App. 780, 950 P.2d 964 (1998). In none of those four cases, though, did the reviewing court find that the appellant

### III. Detective Ringer's Testimony

¶39 Both Morgan and Parker assert claims relating to Detective Ringer's investigation and testimony. First, Morgan asserts that Detective Ringer, as a "fact witness," improperly commented on Morgan's presence in the security footage. Second, Morgan also claims that Detective Ringer improperly testified to Morgan's guilt by association. Third, Parker argues that Detective Ringer improperly tampered with a witness, Clark. None of these arguments prevail.

### A. Detective Ringer's "Fact Witness" Testimony

¶40 Under ER 103(a), error may not be predicated on a ruling that admits or excludes evidence unless it affects a party's substantial rights, and the party specifically objects or moves to strike. We review a trial court's evidentiary rulings for abuse of discretion. *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Lord*, 161 Wn.2d at 283-84.

¶41 Before trial, the court ruled that Detective Ringer could present the video footage to the jury as a fact witness regarding "what is observed on the video." 1 VRP at 123. But "testimony should be limited to who the players are." 1 VRP at 123. The court added, "It gets more problematic if there's testimony that borders on speculation why someone might be doing something at various times. . . . [T]hat kind of testimony would not be admissible by this officer." 1 VRP at 123. The trial court refused to enter a "blanket order" for

---

demonstrated an abuse of discretion. This abuse of discretion standard defers to the trial court's judgment in deciding the admissibility of potentially prejudicial evidence. *See State v. Powell*, 166 Wn.2d 73, 81, 206 P.3d 321 (2009) ("Generally, we defer to the assessment of the trial judge who is best suited to determine the prejudicial effect of a piece of evidence.").

an automatic mistrial if Detective Ringer testified to something objectionable; instead, the trial court requested that the defendants object so the court could excuse the jury to address the matter. 1 VRP at 124.

¶42 Claiming that Detective Ringer testified beyond the scope of the court's pretrial ruling, Morgan cites three instances where the defense successfully objected to Detective Ringer's testimony. In the first instance, the State asked Detective Ringer, "Does the video show [Embry] arriving [at McCabe's] alone or with others?" 7 VRP at 1305. Detective Ringer responded, "Shows him in a group of people arriving, but there doesn't seem to be any interaction between him and the others." 7 VRP at 1305. The defendants successfully objected to Detective Ringer's response, but nobody moved to strike. Later, the State asked Detective Ringer, "[W]here was that car when the lights were turned on?" 8 VRP at 1339. Detective Ringer responded, "Well, you notice that when the lights came on, the pause and then it backed up and pulled around the obstruction in front of it." 8 VRP at 1339. Morgan successfully objected to this interpretation. Again, he did not move to strike. Finally, the State asked Detective Ringer, "Is Mr. Morgan still visible? Do you see Mr. Morgan?" 8 VRP at 1355. Detective Ringer responded, "I am not sure if this is Mr. Morgan." 8 VRP at 1355. Again, Morgan successfully objected but did not move to strike.

¶43 These three instances do little to demonstrate that Detective Ringer's testimony deprived Morgan of a fair trial or prejudiced him. Morgan successfully objected to these statements, but not once did he seek to strike Detective Ringer's responses. Accordingly, because the trial court's ruling did not constitute error or affect Morgan's substantial rights, Morgan does not demonstrate that the trial court erred in handling Detective Ringer's testimony. *See* ER 103(a).

## B. Detective Ringer's Alleged Opinion Testimony

¶44 Morgan next claims that Detective Ringer improperly opined that Morgan was guilty when he testified that the Hilltop Crips and Hoover Crips work together and that gang retaliation for insignificant events can be deadly. But Morgan failed to preserve this issue for appeal.

### 1. Standard of Review

¶45 The trier of fact is the sole and exclusive judge of the evidence. *State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999). No witness, lay or expert, may opine as to the defendant's guilt, whether by direct statement or inference. *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987).

¶46 Defendants fail to preserve an issue for appeal when they do not object to impermissible opinion testimony at trial. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). To raise an error for the first time on appeal, a defendant must demonstrate that the error was "manifest" and truly of constitutional dimension by identifying the constitutional error and showing how the alleged error actually affected his rights at trial. RAP 2.5(a)(3); *Kirkman*, 159 Wn.2d at 926-27. If we determine a claim constitutes a manifest constitutional error, it may still be subject to harmless error analysis. *Kirkman*, 159 Wn.2d at 927. Impermissible opinion testimony regarding a defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury. *Kirkman*, 159 Wn.2d at 927.

### 2. Failure To Preserve

¶47 On direct examination, the State asked Detective Ringer, "Do the Hoovers and the Hilltops associate with

each other on friendly terms?" 7 VRP at 1263. Morgan unsuccessfully objected to this question for *lack of foundation*. On cross-examination, Parker elicited from Detective Ringer, without objection, testimony that the Hoover Crips and Hilltop Crips worked together. Detective Ringer also testified, without objection, that throughout his career investigating gangs, he has identified numerous instances where seemingly insignificant incidents involving gangs quickly escalated to violence.

¶48 Morgan now argues that Detective Ringer opined to Morgan's guilt when he testified that the Hoover Crips and Hilltop Crips work together and that gang retaliation for insignificant incidents can be deadly. But Morgan did not preserve this issue for appeal by failing to timely and specifically object at trial.

¶49 In *State v. Montgomery*, 163 Wn.2d 577, 585, 183 P.3d 267 (2008), detectives followed two defendants as they went from store to store purchasing items authorities believed they later used to manufacture methamphetamine. One detective testified that he " 'felt very strongly that [the defendants] were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes.' " *Montgomery*, 163 Wn.2d at 587-88. The next detective testified that " 'those items were purchased for manufacturing.' " *Montgomery*, 163 Wn.2d at 588. A forensic chemist also testified that the combined purchases " 'lead me toward this pseudoephedrine is possessed with intent [to manufacture methamphetamine].' " *Montgomery*, 163 Wn.2d at 588. The Supreme Court held that these statements constituted improper opinion regarding Montgomery's guilt, as each of these statements went to the core issue and the only disputed element—Montgomery's intent to manufacture methamphetamine. *Montgomery*, 163 Wn.2d at 594. But the Supreme Court ultimately determined that Montgomery failed to preserve this issue for

appeal because he never objected to these statements at trial. *Montgomery*, 163 Wn.2d at 596. Montgomery suffered no actual prejudice because the error was not manifest. *Montgomery*, 163 Wn.2d at 601.

¶50 As in *Montgomery*, Morgan failed to timely and specifically object to an expert's testimony on grounds that it constituted an opinion regarding the defendants' guilt. Moreover, Detective Ringer never testified that he believed this shooting was in retaliation for an earlier assault, or that a Hoover Crip would attempt to murder a person at the request of a Hilltop Crip, or that Morgan was guilty of anything.

¶51 Morgan's failure to specifically object bars him from claiming error. *See* RAP 2.5(a). As in *Montgomery*, the trial court instructed the jury that it was the sole judge of witness credibility; and, as in *Montgomery*, a timely and specific objection could have cured any potential error. Like Montgomery, Morgan failed to preserve this error.

## C. Detective Ringer's Alleged Witness Tampering

¶52 Parker argues that Detective Ringer tampered with a witness, Clark, when he interviewed Clark and showed him the McCabe's video without first notifying Parker and his attorney. Parker's claim falls beyond the scope of the record.

¶53 Witness tampering involves inducing witnesses or potential witnesses to falsely testify, absent themselves from legal proceedings, or withhold information from law enforcement. RCW 9A.72.120(1). The record contains no evidence of Detective Ringer engaging in any such activity. Where an appellant brings a claim on direct appeal, we will not consider matters outside the trial record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Accordingly, we do not address this issue.

IV. Sufficiency of Evidence

¶54  Next, Embry argues that the State presented insufficient evidence to convict him of conspiring to commit first degree murder. Also, both Morgan and Parker argue that the State presented insufficient evidence to convict them of attempted first degree murder and unlawful possession of a firearm. While the State presented sufficient evidence of Embry's conspiracy charge and Morgan and Parker's attempted murder charges, it provided insufficient evidence to convict Morgan and Parker for first degree unlawful possession of a firearm.

A. Standard of Review

¶55  We review insufficient evidence claims for whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *Yarbrough*, 151 Wn. App. at 96. Sufficiency challenges admit the truth of the State's evidence and all reasonable inferences drawn from it. *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980). In determining the sufficiency of the evidence, we do not consider circumstantial evidence any less reliable than direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

¶56  The trier of fact makes determinations of credibility, and we will not review those determinations on appeal. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). We also defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

## B. Embry's Conspiracy Charge

¶57 The jury convicted Embry of conspiracy to commit first degree murder. Washington's conspiracy statute states:

A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

RCW 9A.28.040(1). The State need not show a formal agreement to commit the crime. *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669, *review denied*, 133 Wn.2d 1021 (1997). Conspiracy may be proved by the declarations, acts, and conduct of the parties, or by a concert of action. *Barnes*, 85 Wn. App. at 664. The State can demonstrate concert of action by showing the parties working understandingly, with a single design for the accomplishment of a common purpose. *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987) (quoting *Marino v. United States*, 91 F.2d 691, 694 (9th Cir. 1937), *cert. denied*, 302 U.S. 764 (1938)). And, "[a] person is guilty of murder in the first degree when: . . . [w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.32.030(1)(a).

¶58 Embry argues that the only evidence establishing any agreement between Embry and Parker and Morgan was the security video footage. He contends that because the gang evidence was invalid, the State presented no other evidence that the defendants agreed to commit any crime. Embry's logic is flawed.

¶59 Sufficient circumstantial evidence supports Embry's conspiracy conviction. We previously held herein that the evidence of gang affiliation was properly admitted. The photographs of Embry, Parker, and Morgan together, flashing gang signs, coupled with Detective Ringer's testi-

mony that the Hilltop Crips and Hoover Crips are on friendly terms, support this charge. Clark and Hudson testified that Clark and Parker shared an animosity dating back to the New Year's morning fight. The video showed Embry interacting with Parker and Morgan at McCabe's before the shooting and watching Clark walk around the bar. The video also showed Embry, Parker, and Morgan talking outside McCabe's and Embry and Morgan running off toward Clark's car just moments before Clark and Crimmins walked in the same direction. The video then showed Parker trailing them. Both Clark and Crimmins testified that they saw Embry confront and shoot Clark. Hudson testified that moments after the shooting, he saw Morgan running from the shooting scene; and, Hernandez testified that he saw Embry, with a gun, running from the scene with another individual. Following the shooting, Crimmins and Clark witnessed Embry get into Parker's rental car. Walker testified to seeing men matching Embry's and Morgan's descriptions load into Parker's awaiting rental car shortly after the shooting.

¶60 Embry's challenge admits the truth of the State's evidence and all reasonable inferences drawn from it. *See Theroff*, 25 Wn. App. at 593. During closing, the State outlined some inferences from the evidence. It argued that Parker, a Hilltop Crip, still harbored ill feelings over the New Year's morning fight involving Clark, a YGC. One may infer that Parker recruited members from an ally gang with whom Clark was unacquainted, Embry and Morgan, to retaliate for the perceived disrespect Clark showed Parker on New Year's morning. So, the defendants arrived at McCabe's for hip-hop night. They entered McCabe's unarmed because security would have confiscated any weapon upon entry. The State reasoned that after the defendants exited McCabe's, Morgan approached Parker, who provided Morgan the car keys so Morgan and Embry could retrieve the gun. Embry and Morgan then ran toward the shooting scene ahead of Crimmins and Clark, presumably to get the

gun and shoot Clark. Parker followed Embry and Morgan, as well as Clark and Crimmins, in the same direction, to start the car and be ready to leave immediately following the shooting. The State reasoned that the defendants then dropped off Parker on State Route 512 on their way north and dumped the car in the Green River to keep law enforcement from linking it to the shooting. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found the essential elements to prove that Embry conspired with others to commit first degree murder.

## C. Sufficiency of Morgan and Parker's Attempted Murder Charge

¶61 The jury convicted both Morgan and Parker of attempting to commit first degree murder.[14] State law defines criminal intent: "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1).

¶62 The State laid out the evidence supporting Morgan's and Parker's convictions for attempted first degree murder. Both Clark and Hudson testified to the tension between Clark and Parker dating back to the New Year's morning fight. Witnesses testified that the defendants maintained an interest in a conversation at McCabe's involving Clark regarding the New Year's morning fight. Video footage showed the defendants standing outside McCabe's until Clark exited; then, Parker and Morgan briefly engaged one another before Morgan and Embry ran ahead of Clark and Crimmins toward the shooting scene. The video then shows Parker trailing them in the same general direction. Hudson testified that moments after the shooting, he saw Morgan running from the shooting scene; and, Hernandez testified that he saw Embry, with a gun, running from the scene with

[14] The State charged these men directly and as accomplices.

somebody else. The license plate and description of the getaway car was a near-exact match of Parker's car. Crimmins testified that she saw at least four people in the getaway car as it left the scene, and Walker testified that he saw men matching Morgan's and Embry's descriptions get into the car before it drove away. After the shooting Parker called Borland to pick him up off State Route 512; he told her that his car had been stolen but that he planned to tell police that it was stolen at her apartment. Finally, authorities found Parker's rental car in the Green River.

¶63 During closing, the State summarized its theory for the jury, saying that Morgan and Parker arrived together at McCabe's, and they all left at similar times, with Morgan and Embry running together out of the video toward the shooting, followed shortly thereafter by Parker. Throughout the night in McCabe's, the defendants had an interest in Clark's interactions with others. As McCabe's closed and patrons filed out into the parking lot, Embry, Morgan, and Parker all spoke with each other at various times, and the State theorized that as soon as he spotted Clark leave the club, Morgan approached Parker, took Parker's keys, and ran with Embry, ahead of Clark and Crimmins, to retrieve the gun. The State then argued that after Morgan and Embry retrieved the gun, Parker waited in his rental car for Embry and Morgan so that they could get in and quickly leave the scene.

¶64 Morgan and Parker's challenges admit the truth of the State's evidence and all reasonable inferences drawn from it. *See Theroff*, 25 Wn. App. at 593. Viewing the evidence in a light most favorable to the State, using the State's theory of the case, a rational trier of fact could have found the essential elements required to prove that Morgan and Parker acted as Embry's accomplices in an attempt to commit first degree murder.

D. Morgan and Parker's Firearm Possession Charge

¶65 Both Morgan and Parker next correctly argue that the State provided insufficient evidence for any rational

trier of fact to convict them of unlawful possession of a firearm. Accordingly, we reverse their convictions for first degree unlawful possession of a firearm.

¶66 Washington's unlawful possession of firearms statute states:

A person . . . is guilty of the crime of unlawful possession of a firearm in the first degree, if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted . . . in this state or elsewhere of any serious offense.

RCW 9.41.040(1)(a). One may constructively possess a firearm jointly with another person. *State v. Turner*, 103 Wn. App. 515, 521, 13 P.3d 234 (2000). Evidence may demonstrate that an individual constructively possesses a firearm if it supports an inference that the defendant had dominion and control over the firearm or premises in which the firearm was found. *Turner*, 103 Wn. App. at 521. This control need not be exclusive, but to prove constructive possession, the State must show more than mere proximity to the contraband. *State v. George*, 146 Wn. App. 906, 920, 193 P.3d 693 (2008).

¶67 Here, both Morgan and Parker stipulated that they had been convicted of prior serious offenses. The State never asserted that either Morgan or Parker ever actually possessed the gun, so we must decide whether the evidence supports the notion that Morgan or Parker constructively possessed the weapon. Authorities found no gun at the scene. Hernandez testified that immediately after the shooting, Embry had the gun in his hand. And Crimmins said she followed Embry from the time of the shooting until he entered the awaiting getaway car. But no witnesses testified to seeing Embry get into the car with the weapon. The State argues that one may reasonably infer that Embry carried the gun into the getaway car. So, Morgan and Parker may have known Embry possessed the gun. But the State presented no evidence that the gun ever entered the

getaway car or that either Parker or Morgan ever exercised control or dominion over the weapon. And authorities did not recover the gun from Parker's car when it was pulled from the Green River. Moreover, even if the gun entered the car, and Parker and Morgan were both inside, Parker and Morgan's proximity to the gun would be insufficient to prove constructive possession. *See George*, 146 Wn. App. at 920.

¶68 Evidence may demonstrate that Morgan and Parker constructively possessed the firearm if it supports an inference that Morgan and Parker had dominion and control over the vehicle in which the firearm was found. *See Turner*, 103 Wn. App. at 521. Here, the State presented no evidence regarding who controlled or exercised dominion of the car following the shooting. So, even viewing this evidence in a light most favorable to the State, a rational trier of fact would have difficulty making reasonable inferences to find the essential elements to prove that Morgan or Parker constructively possessed this firearm. Therefore, we reverse for insufficient evidence Parker's and Morgan's convictions for first degree unlawful firearm possession.

## V. Misconduct

¶69 Morgan and Parker next argue that the State committed misconduct for various reasons. First, Morgan asserts that the State and Detective Ringer impermissibly commented on Morgan's right to remain silent. Second, Morgan and Parker allege that the State impermissibly vouched for Detective Ringer's credibility during closing argument. Third, Parker argues that the State violated a pretrial order by eliciting testimony that Crimmins knew Parker through her former employment at the Department of Corrections (DOC). And fourth, Parker asserts that the State improperly characterized the defendants as a " 'pack of wolves' " during closing argument. SAG (Parker). These arguments fail.

## A. Standard of Review

¶70 To establish prosecutorial misconduct, a defendant must show both improper conduct and resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). If defendants object to improper conduct at trial, they must show that the State's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Emery*, 174 Wn.2d at 760. Defendants fail to preserve a prosecutorial misconduct claim for appeal when they do not object at trial to alleged misconduct, unless the misconduct is so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998).

## B. Comment on Morgan's Right To Remain Silent

¶71 Both the United States and Washington Constitutions guarantee an individual's right to remain silent. U.S. Const. amend. V; Wash. Const. art. I, § 9; *State v. Knapp*, 148 Wn. App. 414, 420, 199 P.3d 505 (2009). And, "[a] police witness may not comment on the silence of the defendant so as to infer guilt from a refusal to answer questions." *State v. Lewis*, 130 Wn.2d 700, 705, 927 P.2d 235 (1996). To determine whether the State commented on a defendant's silence, we must first decide whether the State manifestly intended the remarks to be a comment on that right. *State v. Burke*, 163 Wn.2d 204, 216, 181 P.3d 1 (2008). And the State improperly comments on a defendant's silence when it uses the defendant's silence to its own advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt. *Lewis*, 130 Wn.2d at 707.

¶72 A defendant may invoke his right to silence after questioning begins, but the invocation must be clear and unequivocal. *State v. Hodges*, 118 Wn. App. 668, 673, 77 P.3d 375 (2003), *review denied*, 151 Wn.2d 1031 (2004). And when a defendant does not remain silent and instead talks to police, the State may comment on what the defendant does not say. *State v. Clark*, 143 Wn.2d 731, 765, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000 (2001).

### 1. Detective Ringer's Alleged Misconduct

¶73 Here, Detective Ringer read from his report detailing his communications with Morgan during the investigation. Detective Ringer had invited Morgan to the Tacoma Police Department to view McCabe's security video and look at other evidence. Before the interview, Detective Ringer read Morgan his *Miranda*[15] warnings; and, Morgan indicated that he understood his rights and was willing to speak. At no point did Morgan ask Detective Ringer for an attorney or to stop the interview.

¶74 Detective Ringer spoke with Morgan and then played the video and presented him with still photographs from the video. Morgan identified himself as the man wearing a red hooded sweatshirt and stated that he did not recognize Clark in the photos. Morgan acknowledged that he was pictured jogging out of the picture just before the shooting. When the video finished, Morgan stated, "It is what it is. You will be able to put it all together." 7 VRP at 1261.

¶75 Then, according to Detective Ringer:

[Morgan] also made it clear that the code he was raised with would not allow him to cooperate or testify against others. His answer was, quote, "I'll take my chances with the court. I have got to go all the way, trial, witnesses, everything," end quote.

[Morgan] also said on multiple occasions, quote, "That is what it is right there," end quote. He repeated that, quote,

---

[15] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"Can't do anything but go to trial with that. Can't do anything else," period, end quote.

7 VRP at 1261. Then, Morgan continued to answer questions.

¶76 During closing argument, the State argued:

Code of the street is garbage. Code of the street: Don't cooperate with the police. Shoot people. Kill people. In this scenario, don't talk to the police about it.

Well, any criminal, of course, committing an act won't talk to the police. That makes sense because they are going to jail. They're going to be held accountable.

10 VRP at 1598. None of the defendants objected to these comments.

¶77 In *Hodges*, a defendant waived his *Miranda* rights and spoke with law enforcement. 118 Wn. App. at 670-71. He claimed on appeal that his refusal to answer the question "What happened next?" asserted his right to silence such that questioning should have ceased. *Hodges*, 118 Wn. App. at 671. There, his failure to respond to the question was not a clear and unequivocal invocation of the right to silence because he did not, in fact, remain silent and instead answered other questions; so, under the totality of the circumstances he did not clearly and unequivocally invoke his right to silence. *Hodges*, 118 Wn. App. at 673. Like *Hodges*, authorities read Morgan his *Miranda* warnings and continued the interview. Like Hodges, Morgan never clearly and unequivocally invoked his right to an attorney. Unlike Hodges, who refused to answer a question at one point, Morgan continued his interview with Detective Ringer even after the exchange in which he said his street code values prevented him from cooperating with police or testifying against others.

### 2. The State's Alleged Misconduct

¶78 Regarding the State's closing comments, because no one objected, Morgan did not preserve this issue

for appeal unless he can demonstrate that the State's comments were so flagrant and ill intentioned that a curative instruction would not have remedied them. *See Emery*, 174 Wn.2d at 760-61. And while our Supreme Court in *Emery* cites *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011), as an example of prejudicial misconduct incurable by an instruction, *Monday* is distinguishable from the present matter. *Emery*, 174 Wn.2d at 758. In *Monday*, the State repeatedly invoked an "alleged African American, antisnitch code to discount the credibility of his own witnesses." *Monday*, 171 Wn.2d at 678. The State referenced the antisnitch code's use by " 'black folk' " and intentionally and improperly imputed its use to black persons only. *Monday*, 171 Wn.2d at 674. Unlike *Monday*, here, the State never tied the "code of the street" to a particular race. Therefore, the State's comments do not carry the same flagrance and ill intent of *Monday*. Accordingly, even if we assume without holding that the comments were improper, Morgan cannot demonstrate that the State committed misconduct so flagrant and ill intentioned such that it could not have been cured by a jury instruction. Therefore, he did not preserve this issue for appeal.

## C. Vouching for Detective Ringer

¶79 The State may not vouch for a government witness's credibility. *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010), *review denied*, 170 Wn.2d 1016 (2011). The trier of fact has sole authority to assess witness credibility. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Vouching occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony. *State v. Smith*, 162 Wn. App. 833, 849, 262 P.3d 72 (2011), *review denied*, 173 Wn.2d 1007 (2012).

¶80 Morgan and Parker assert that the State impermissibly vouched for Detective Ringer's credibility when

it stated during closing that "[l]aw enforcement did a great job investigating this case." 10 VRP at 1613. But this statement does not place the prestige of the government behind the witnesses or indicate that information not presented supported Detective Ringer's testimony. And even if this statement did constitute error, because neither defendant objected to this statement, they must demonstrate that the State's remark was so flagrant and ill intentioned that an instruction could not have cured any prejudice. *See Emery*, 174 Wn.2d at 760-61.

¶81 The State's comment that "[l]aw enforcement did a great job investigating this case" may have encouraged the jury to infer that law enforcement is credible; but, no party objected. In the context of the total argument, issues of the case, evidence, and jury instructions—even if this comment was improper—Morgan and Parker cannot show that the State's single remark was so flagrant and ill intentioned that it evinced an incurable, enduring, and resulting prejudice. The court instructed the jury that it was the sole credibility judge of each witness and that the attorneys' statements were not evidence. Furthermore, the State informed the jury that it was to make all credibility determinations. Thus, Morgan and Parker did not preserve this issue.

## D. Crimmins's DOC Ties

¶82 Parker next asserts that the State improperly elicited testimony that Crimmins knew Parker from her former employment at the DOC. We disagree.

¶83 When Crimmins testified on May 5, the State asked her what her last job was; and she responded that she worked at the DOC probation office. Then on May 10, still during Crimmins's direct examination, the State asked:

Q Were you on friendly terms with Mr. Parker? How long a period [of] time have you known Mr. Parker?

A Well, I never really know [sic] him personally.

Q When did you first know who he was?

A From work.

Q And just give me a time period. A year? Two years? Month?

A I couldn't tell you for sure how long he reported to my office.

4 VRP at 493. Parker objected to this questioning and moved to strike, but the court simply ordered the State to ask a different question.

¶84 First, as the trial court never issued an order barring Crimmins from testifying to her work knowledge of Parker, Parker's argument fails. Second, the State questioned Crimmins to find out *how long* she had known Parker, and Crimmins answered nonresponsively. Third, each of the defendants stipulated to having been convicted of a serious felony in the past, so, regardless, the jury later learned of their DOC contact. Parker cannot show that the State engaged in any improper conduct or that the conduct caused resulting prejudice incurable by an instruction. Therefore, Parker's claim fails.

### E. Characterizing Defendants as Animals

¶85 Parker asserts that the State improperly referred to the defendants as animals. He claims that the State asked the jury to " 'review the video tape and see the victim as he walks through the pack of wolves' or something similar." SAG (Parker).

¶86 Before trial, Embry raised concern that the State or Detective Ringer may use a phrase like "[t]he sharks are circling the victim" in the video narration—injecting an opinion of guilt. 1 VRP at 116. During rebuttal closing, though, the State described a brief interaction that occurred when Clark stepped on Embry's foot as Clark descended the stairs at McCabe's: "When's the only other time that [Clark] interacts with Mr. Embry? When Mr. Clark walks through the wolves and steps on apparently—or does something, brushes up against Mr. Embry." 11 VRP at 1756. Parker did not object.

¶87 The State's comment here resembles a comment in *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006). In *Gregory*, a murder and rape case, Gregory argued that the State impermissibly characterized him as " 'evil' " and a " 'menace to society.' " *Gregory*, 158 Wn.2d at 863. The Supreme Court held, though, that the State may draw inferences from the evidence, and these inferences could have been justified given Gregory's criminal history and the facts of the case. *Gregory*, 158 Wn.2d at 863. The court further reasoned that neither of the comments drew objection and an instruction to the jury to disregard these brief characterizations could have neutralized any prejudice. *Gregory*, 158 Wn.2d at 863-64. The court ultimately declined to hold that the State's comments denied Gregory due process. *Gregory*, 158 Wn.2d at 864.

¶88 The State's describing the defendants as "wolves" may be ill intentioned and flagrant; but, Parker cannot show an enduring, resulting prejudice. The *Gregory* court did not find prejudice in the State's commenting that a defendant was " 'evil' " and a " 'menace to society.' " *Gregory*, 158 Wn.2d at 863. Accordingly, we will not find prejudice in the State referring to the defendants as "wolves." This single characterization, within a lengthy trial, is not so flagrant and ill intentioned that it evinces an enduring and resulting prejudice incurable by a curative instruction and that affected the jury's verdict. Therefore, Parker did not preserve this issue.

## VI. Alleged Jury Instruction Errors

¶89 Embry, Morgan, and Parker each claim error relating to jury instructions. First, Morgan and Parker claim denial of due process because the trial court failed to delineate the essential elements of premeditation in the "to convict" instruction. Second, Parker and Morgan claim that the trial court erred in reading the jury confusing and conflicting instructions defining "substantial step." And

third, Embry asserts that the trial court erred in reading a jury instruction that implied the jury must be unanimous to answer "no" on the special verdict form. We hold there was no reversible error.

¶90 When considering a jury instruction challenge, we review the instructions as a whole. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996). The instructions must properly inform the jury of the applicable law, may not be misleading, and must permit each defendant to argue its theory of the case. *State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999). We review the adequacy of jury instructions de novo. *Pirtle*, 127 Wn.2d at 656.

¶91 Generally, an appellant cannot raise an issue relating to alleged jury instruction errors for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a). The appellant must show that (1) the error is "truly of constitutional dimension" and (2) the error was "manifest." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Appellants cannot simply assert that an error occurred below and label the error "constitutional"; instead, they must identify an error of constitutional magnitude and show how the error actually affected their rights at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). If appellants successfully show that a claim raises a manifest constitutional error, then the State must prove that the error was harmless beyond a reasonable doubt. *Gordon*, 172 Wn.2d at 676.

¶92 To determine whether an error is truly of constitutional dimension, we first look to the asserted claim and assess whether, if the claim is true, it implicates a constitutional interest, as compared to another form of trial error. *O'Hara*, 167 Wn.2d at 98. Jury instruction errors, however, are not automatically constitutional in magnitude. *See State v. Scott*, 110 Wn.2d 682, 691, 757 P.2d 492 (1988).

## A. Essential Element: Premeditation

¶93 A "to convict" jury instruction must contain all the elements of the crime because it serves as a " 'yardstick' " by which the jury measures the evidence to determine guilt or innocence. *State v. Sibert*, 168 Wn.2d 306, 311, 230 P.3d 142 (2010) (internal quotation marks omitted) (quoting *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). And a trial court denies a defendant's right when it fails to delineate in the "to convict" instruction all of the essential elements of the crime charged. *Smith*, 131 Wn.2d at 263.

¶94 But we held in *State v. Reed*, an attempted first degree murder case, that the premeditation element is not required in the "to convict" jury instruction. 150 Wn. App. 761, 772, 208 P.3d 1274, *review denied*, 167 Wn.2d 1006 (2009). The State had charged Reed with attempted first degree murder. *Reed*, 150 Wn. App. at 762. He argued that his "to convict" instruction was erroneous because it did not contain the essential premeditation element. *Reed*, 150 Wn. App. at 769. Instead, the trial court read two separate instructions, one containing a "first degree murder" definition and a second one defining "premeditation." *Reed*, 150 Wn. App. at 772. We held that since Reed was not charged with first degree murder (instead, *attempted* first degree murder), the State did not need to prove that he acted with premeditation to commit the murder, only that he attempted to commit murder. *Reed*, 150 Wn. App. at 772-73.

¶95 *Reed* is on point. Here, the "to convict" instruction contained the following:

To convict the defendant, Bryant Deshean Morgan, of the crime of attempted murder in the first degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 24th day of February, 2009, the defendant or an accomplice did an act that was a substantial step toward the commission of murder in the first degree;

(2) That the act was done with the intent to commit murder in the first degree; and

(3) That the act occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP (Embry) at 179. Another instruction defined "first degree murder": "A person commits' the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." CP (Embry) at 175. And another instruction defined "premeditation":

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

CP (Embry) at 176. The defendants never objected to these instructions, so Morgan and Parker must demonstrate manifest constitutional error.

¶96 As in *Reed*, here the trial court's instructions accurately defined the law and the elements of the relevant crimes. As a whole, the jury instructions properly informed the jury of the applicable law; and, the State maintained its burden to prove the elements of attempted first degree murder. Parker and Morgan fail to demonstrate manifest constitutional error such that they may raise this issue for the first time on appeal. Even had they preserved this alleged error, their claim fails because the trial court properly instructed the jury.

## B. Defining "Substantial Step," Weighing Credibility, and Unanimity Requirements

¶97 Parker and Morgan claim that the court's conflicting definitions of "substantial step," found in instructions 13 and 27, improperly allowed their convictions. Instruction 13 defines "substantial step": "conduct, that strongly indicates a criminal purpose and which is more than mere preparation." CP (Embry) at 177. Then, instruction 27 defined "substantial step": "A substantial step is conduct of the defendant, which strongly indicates a criminal purpose." CP (Embry) at 191. They do not allege that either of these instructions is incorrect.

¶98 The defendants also did not object to these instructions. And before closing arguments, the State alerted the trial court that two instructions defined "substantial step." The trial court said, "[W]hen I read them, I will just inform the jury that it's a duplicate rather than to renumber the sets." 9 VRP at 1560. Because they failed to object, they must show that any error was of a constitutional dimension and that the error was manifest. *See Gordon*, 172 Wn.2d at 676. Because the trial court agreed to alert the jury to the duplicative instruction, any confusion over the two "substantial step" instructions was minimal. Therefore, Parker and Morgan cannot demonstrate prejudice.

¶99 Morgan and Parker also argue, for the first time on appeal, that instruction 19 was misleading. Instruction 19 stated, "You may give such weight and credibility to any alleged out-of-court statements of the defendant, Embry[,] as you see fit, taking into consideration the surrounding circumstances." CP (Embry) at 183. They allege that because the trial court instructed the jury one way as to Embry's statements, through deductive reasoning, the jury viewed differently the statements of Parker and Morgan. But Embry was the only defendant to testify; and, his testimony created conflicts regarding the content of his

out-of-court statements. So an instruction pertaining to Embry alone did not constitute error. Neither Parker nor Morgan objected, and even if this instruction did constitute error, they cannot demonstrate prejudice.

¶100 Finally, Embry claims that the special verdict form regarding the firearm sentencing enhancement improperly implied that the jury must unanimously answer "no." But his claim fails because our Supreme Court recently overruled the nonunanimity rule on which Embry relied. *See State v. Guzman Nuñez*, 174 Wn.2d 707, 719, 285 P.3d 21 (2012). The trial court properly required the jury to unanimously decide the firearm sentencing enhancement.

## VII. Ineffective Assistance of Counsel

¶101 The defendants each claim that defense counsel provided ineffective assistance. Embry claims that his counsel deprived him of effective assistance because he did not seek instructions on lesser-included offenses, like attempted second degree murder and conspiring to commit second degree murder. Parker and Morgan claim their counsel provided ineffective assistance because they failed to seek limiting instructions relating to Hudson's and Detective Ringer's testimony. But Embry, Parker, and Morgan fail to show deficiency in counsels' performance, nor do they demonstrate prejudice.

### A. Standard of Review

¶102 Washington has adopted the United States Supreme Court's two-pronged *Strickland* test for questions of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Cienfuegos*, 144 Wn.2d 222, 226, 25 P.3d 1011 (2001). The *Strickland* inquiry states:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."

*State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (alteration in original) (quoting *Strickland*, 466 U.S. at 687). Under this standard, performance is deficient if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

¶103 The threshold for the deficient performance prong is high, given the deference afforded to defense counsel's decisions in the course of representation. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012). To prevail on an ineffective assistance claim, a defendant alleging ineffective assistance must overcome a strong presumption that counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33. Also, counsel's performance is not deficient when her or his conduct can be characterized as legitimate trial strategy or tactics. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

## B. Failing To Include Instructions on Lesser-Included Offenses

¶104 Counsel's decision to not request an instruction on a lesser-included offense does not constitute ineffective assistance of counsel if it can be characterized as part of a legitimate trial strategy to obtain an acquittal. *State v. Hassan*, 151 Wn. App. 209, 218, 211 P.3d 441 (2009). In *Hassan*, Division One of this court held that an "all-or-nothing" strategy was not objectively unreasonable because "the only chance for an acquittal was to not request a lesser

included instruction." 151 Wn. App. at 221. And, in *Grier*, our Supreme Court rejected a defendant's ineffective assistance claim because "[a]lthough risky, an all or nothing approach was at least conceivably a legitimate strategy to secure an acquittal." 171 Wn.2d at 42.

¶105 Here, Embry claims ineffective assistance because counsel did not request a jury instruction on lesser-included offenses of attempted second degree murder and conspiracy to commit second degree murder. Embry argued at trial that he did not shoot Clark. His defense centered on misidentification. Therefore, counsel had a legitimate reason to take an all-or-nothing approach to try to secure Embry's acquittal. Therefore, because counsel's conduct in not seeking instructions on the lesser-included offenses can be characterized as legitimate trial strategy, his performance was not deficient. *See Kyllo*, 166 Wn.2d at 863.

## C. Failing To Propose Limiting Instructions

¶106 Parker and Morgan claim that their counsel provided ineffective assistance because they failed to seek limiting instructions regarding Hudson's and Detective Ringer's testimonies. Not requesting a limiting instruction can be a legitimate tactic to avoid reemphasizing damaging evidence. *Yarbrough*, 151 Wn. App. at 90. Thus, an appellant must rebut this strong presumption of reasonable performance by demonstrating that counsel's tactical choice would have been unreasonable given the circumstances. *See Grier*, 171 Wn.2d at 34.

¶107 The State called Hudson to testify to his impressions based on his observations at McCabe's. The trial court told defense counsel that it would consider a limiting instruction if the defense wanted one. Defense counsel declined. Parker claims, "Where the trial court recommended the [limiting] instruction, there can be no legitimate strategic or tactical advantage to fail to propose one." Br. of Appellant Parker at 37. Here, though, the trial court

did not recommend a limiting instruction. It said, "If you want to propose a limiting instruction . . . I would consider giving it." 6 VRP at 890. As Parker's counsel may have legitimately sought to avoid emphasizing Hudson's damaging testimony by not offering a limiting instruction, Parker does not rebut the strong presumption of counsel's reasonable performance.

¶108  Next, Detective Ringer testified for two reasons. He testified as an expert on gang culture; and, he testified as a fact witness to identify the individuals in the video. At trial, Parker's counsel acknowledged the difficulty in distinguishing between when Detective Ringer would be testifying as an expert and as a fact witness: "I think the expert testimony needs to be, you know, limited to things the jury could not otherwise understand, and which is almost nothing." 8 VRP at 1332. The trial court said, "I will consider a limiting instruction, if you want to—if you want me to give one regarding that, that basically ultimately the jury will be the ones to decide what is actually shown on the video." 8 VRP at 1333. The State stated that it preferred the limiting instruction, but Morgan's counsel disagreed: "I don't think we should have a limiting instruction. . . . The video speaks for itself. If the jury sees that, they see it. If they don't see it, they don't see it." 8 VRP at 1333.

¶109  This exchange demonstrates defense counsel's tactical considerations in not seeking a limiting instruction. As Morgan's and Parker's counsel may have legitimately avoided focusing the jury on Detective Ringer's damaging testimony by not offering a limiting instruction, they do not rebut the strong presumption of counsel's reasonable performance.

VIII. Allegedly Invalid Sentencing

¶110  Embry next claims that his judgment and sentence is facially invalid because he was sentenced to 240 months for conspiracy to commit first degree murder and he was

also sentenced to a 60-month weapon enhancement that was not contained in his charging information. He also claims that because each of his charges stemmed from criminal activity that occurred at the same time with the same victim, the court should have merged his sentence on the conspiracy to commit first degree murder with his sentence on the attempted first degree murder conviction and run them concurrently. These claims lack merit.

### A. Enhancement Included in Charging Document

¶111 Defendants may challenge a defective charging document for the first time on appeal; but, where they have failed to raise such a challenge at trial, we construe the document liberally in favor of validity. *State v. Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). We apply a two-part test to determine the validity of the charging document: (1) we determine whether the necessary facts appear in any form, or by fair construction they can be found in the charging document, and if they do appear, (2) we determine whether the defendant shows that he was nonetheless actually prejudiced by the inartful language that caused the lack of notice. *Kjorsvik*, 117 Wn.2d at 105-06.

¶112 Embry challenges the adequacy of his charging document. But his second amended information contains the necessary facts to provide Embry notice of the enhancement when it advises him of "adding additional time to the presumptive sentence" for his being armed with the handgun. CP (Embry) at 67. Therefore, Embry's challenge fails the first part of the *Kjorsvik* test. *See Kjorsvik*, 117 Wn.2d at 105.

### B. Same Criminal Conduct

¶113 Next, Embry argues that the trial court erred in sentencing him to consecutive sentences on his conspiracy and attempted first degree murder charges. He claims the

sentences should run concurrently because the offenses involved the same victim and occurred at the same time.

¶114 We review a trial court's ruling with respect to "same criminal conduct" for an abuse of discretion. *State v. Elliott*, 114 Wn.2d 6, 17, 785 P.2d 440, *cert. denied*, 498 U.S. 838 (1990). A court abuses its discretion if it is exercised on untenable grounds or for untenable reasons. *Lord*, 161 Wn.2d at 283-84.

¶115 If a sentencing court finds a defendant's multiple current offenses constituted the "same criminal conduct," it should treat the multiple offenses as one crime for scoring purposes and all sentences within that same criminal conduct should run concurrently. RCW 9.94A-.589(1)(a). " 'Same criminal conduct[ ]' . . . means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a).

¶116 During sentencing Embry argued that under the Sentencing Reform Act of 1981, chapter 9.94A RCW, the conspiracy and attempted murder counts involved the same criminal conduct; and, the State disagreed. The trial court contemplated this issue and agreed with the State:

> I think that they are separate criminal conducts. I think that they are separate intent [sic] involved. Certainly the conspiracy could have occurred without the attempted murder occurring; the conspiracy all that required was that there be an agreement between the principals to undertake the event. At any point Mr. Embry or Mr. Morgan or Mr. Parker could have lawfully ended that portion of their involvement and they chose not to do it.
>
> I think that they did, in fact, there was—there were separate crimes that were committed and so that the two serious violents should be served consecutively.

11 VRP at 1818.

¶117 Here, the trial court heard all the evidence presented at trial and exercised its discretion in determining

that for sentencing purposes, the conspiracy and attempted first degree murder counts did not constitute the same criminal conduct. The trial court reasonably justified why it chose not to characterize the charges as same criminal conduct. As the trial court did not exercise its discretion on untenable grounds or for untenable reasons, it did not abuse its discretion. *See Lord,* 161 Wn.2d at 283-84.

## IX. Cumulative Error

¶118 Both Morgan and Parker assert that cumulative error deprived them of a fair trial. We conclude that the cumulative error doctrine does not apply.

¶119 Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of trial errors effectively deny the defendant's right to a fair trial, even if each error alone would be harmless. *State v. Weber,* 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied,* 551 U.S. 1137 (2007). The doctrine does not apply where errors are few and have little or no effect on the trial's outcome. *Weber,* 159 Wn.2d at 279.

¶120 Here, the only errors preserved for appeal involve the insufficient evidence to convict Morgan and Parker for first degree unlawful possession of a firearm. Those errors result in the reversal of those convictions. Other errors may have occurred during this lengthy trial; but, the defendants failed to preserve these issues for appeal. Neither Morgan nor Parker demonstrates that the combined effect of any trial errors denied them their right to a fair trial. Therefore, the cumulative error doctrine does not apply.

¶121 We reverse Parker's and Morgan's convictions for first degree unlawful possession of a firearm and remand for resentencing, and we affirm all other convictions and sentences.

PENOYAR, J., concurs.

¶122 ARMSTRONG, J.[*] (dissenting) — The trial court correctly denied the State's first attempt to introduce gang evidence, essentially reasoning the State had not shown that Tyrick Clark's shooting was gang related: "I think the infusion of the gang—without more, without saying that the incident at [54th Street Bar and Grill] involved all three [codefendants], that it was a known battle over drug turf or economic related offenses, something along those lines . . . is stretching the admissibility of gang [evidence]." 1 Report of Proceedings (RP) at 51. But the trial court erred when, on reconsideration, it allowed the evidence after viewing earlier photos of the three defendants together flashing gang signs. Because the State did not initially show that the Clark shooting was gang related, and the photos provided no support for the argument that Clark's shooting was gang related, a necessary predicate to admitting gang evidence, I dissent.

## FACTS

### I. STATE'S OFFER OF PROOF

¶123 The State asserted that the gang evidence would establish that Randall Embry, Bryant Morgan, and Andre Parker knew each other; that Parker recruited Embry and Morgan, because of their related gang associations, to shoot or assist in shooting Clark; and that Morgan and Embry were willing to assist because Parker was in a related gang, the Hilltop Crips. The State also asserted that the gang evidence showed Parker's motive to "retaliat[e]" for the January 1 incident because "when you have issues involving gang members, this is expected and it's more than just loss of a fight, go back and fight again, it can be very deadly," and that "[t]he level of violence that gang members use as compared to other citizens [was] important to convey

---

[*] Judge David H. Armstrong is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

to the jury." 1 RP at 19, 38-39. Further, the State argued that the gang evidence was important to show Embry's "willingness, because of his gang association with the Hoover[ Crip]s," to shoot Clark and that Parker and Morgan were "fellow gang members . . . acting in support of each other, considering the January 1st incident." 1 RP at 38. Finally, the State argued that the gang evidence would show Embry, Morgan, and Parker's premeditated, planned shooting of Clark.

## II. GANG EVIDENCE AT TRIAL

¶124 At trial, a witness testified that Clark was an active member of the Young Gangster Crips.[16] Morgan acknowledged that he was in the "Five Deuce" or 52nd Street Hoover Crips, and Embry acknowledged belonging to the 74th Street Hoover Crips, both Seattle gangs. Parker acknowledged his membership in the Hilltop Crips, a Tacoma gang. Clark testified that the January 1 nightclub fight involved Young Gangster Crips and Hilltop Crips, but the fight was not gang related. The State offered no evidence that the Young Gangster Crips and Hilltop Crips were rival gangs or were feuding over the January 1 incident. Witnesses testified that Parker and Clark had a "beef" with each other from the incident, but no one testified that it had any gang connection. 6 RP at 908. Finally, the State offered no evidence that Embry, Morgan, or Parker wore gang colors, displayed bandanas, uttered words or phrases related to gangs, exchanged gang taunts with Clark, or otherwise engaged in gang activity immediately before, during, or after Clark's shooting.

¶125 Detective Ringer testified that Hoover Crips "get along well" with Hilltop Crips and that the two gangs had "worked together" in committing "drug crimes" and "[p]roperty kind" of crimes. 7 RP at 1263-64; 8 RP at 1396-97. But

---

[16] Clark testified at trial that he had quit the Young Gangster Crips a few years earlier.

he could recall no shooting incident in which the two gangs had collaborated. Furthermore, he testified that Embry and Morgan were members of the Seattle Hoover Crips gang, the Seattle and Tacoma Hoover Crips were "separate and distinct," Detective Ringer's focus was not on King County gangs, and he had not studied specific Hoover Crips gang affiliations. 8 RP at 1394-95, 1463-64.

¶126 Detective Ringer also testified that he had seen "[n]umerous occasions" where "seemingly insignificant incidents quickly escalate[d] to violence." 8 RP at 1387. For example, gang members who misperceive a hand wave as flashing a gang sign will sometimes respond with a fatal shooting. But Detective Ringer offered no testimony, either generalized or specific to the Hilltop and Seattle or Tacoma Hoover Crips, of gang mores regarding respect among gang members; of the necessity for retaliation in the face of perceived disrespect; of the necessity for or willingness of gang members to assist a member of an allied gang in retaliating for perceived disrespect; or that Embry, Morgan, or Parker adhered to such mores. Although Detective Ringer testified that gang members will generally lend each other vehicles or firearms, which, if used to commit a crime, the borrower will dispose of, he did not testify that the Hilltop Crips, Seattle or Tacoma Hoover Crips, Embry, Morgan, or Parker followed these mores.

## III. State's Closing Argument

¶127 The State argued that Parker arranged Clark's shooting because of his "level of anger [and] degree of disrespect" caused by Clark punching him. 10 RP at 1564-65. The State argued that Embry shot Clark to retaliate for the punch of Parker and because Embry felt "[a]nimosity" toward Clark because

[Embry] knew the characters involved, he knew the YGC [(Young Gangster Crips)] connection, the Andre Parker connection, the Hilltop Crip connection.

. . . .

So [Embry], who's pictured with the Hilltop Crips, who hangs with the Hilltop Crips even though he's a Hoover [Crip, Clark is] the bad guy. . . . That's the enemy. That's the person that [Embry] has, by virtue of his relationship with the others, animosity toward.

11 RP at 1764-65.

¶128 The State argued, regarding Hilltop and Hoover Crips, that the question was

"[d]o they associate with each other" such that *in situations like this, logically, you need help, you get help.*

And the answer's yes. We have pictures of them together. We know that these particular individuals, *regardless of their gang connection*, associate with each other. We know from the evidence that they are in two different gangs.

11 RP at 1771-72 (emphasis added).

¶129 Finally, the State argued:

Now, *other than the gang world, which is what the relevance of this is*, what other type of situation would you have where a casual acquaintance that wasn't at the [January 1] incident would come to McCabe's and the other guy would come up and say, "Hey, I had this incident with this guy [on January 1] two months ago. Would you mind killing him for me?" "No. I am not going to kill him."

But where would that kind of mentality and that kind of comfort level come? Drip. Spider Deuce. Deezy . . . . They have that comfort level. All of them are okay with this shooting. All of them.

11 RP at 1772 (emphasis added).

## ANALYSIS

### I. STANDARD OF REVIEW

¶130 I agree with the majority's discussion of our standard of review. I would add only that a trial court bases a discretionary decision on untenable grounds or makes it for

untenable reasons if it rests on facts unsupported in the record. *State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008). Also, we review a trial court's decision to admit gang evidence under ER 404(b). Under that section, evidence of prior bad acts is presumptively inadmissible. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003); *see also State v. McCreven*, 170 Wn. App. 444, 458, 284 P.3d 793 (2012). ER 404(b) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In other words, ER 404(b) prohibits admitting evidence to show a person's character to prove the person acted in conformity with that character on a particular occasion. *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002); *see also McCreven*, 170 Wn. App. at 458 (stating the same); *State v. Mee*, 168 Wn. App. 144, 153-54, 275 P.3d 1192 (stating the same), *review denied*, 175 Wn.2d 1011 (2012).

> "ER 404(b) is not designed to deprive the State of relevant evidence necessary to establish an essential element of its case, but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged."

*Mee*, 168 Wn. App. at 154 (internal quotation marks omitted) (quoting *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007)). ER 404(b) forbids the State from suggesting this inference to the jury because it contradicts "the fundamental American criminal law belief in innocence until proven guilty, a concept that confines the fact finder to the merits of the current case in judging a person's guilt or innocence." *State v. Wade*, 98 Wn. App. 328, 336, 989 P.2d 576 (1999).

## II. Insufficient Factual Nexus

¶131 We consider gang evidence prejudicial due to its general "inflammatory nature." *State v. Asaeli*, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009). Before the trial court can admit gang evidence, it must find a nexus between the gang evidence and the charged crimes. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009); *cf. State v. Bluehorse*, 159 Wn. App. 410, 429-31, 248 P.3d 537 (2011) (holding that substantial evidence did not support finding that crime was gang related). Thus,

> generalized evidence regarding the behavior of gangs and gang members, absent (1) evidence showing adherence by the defendant or the defendant's alleged gang to those behaviors and (2) a finding that the evidence relating to gangs is relevant to prove the elements of the charged crime, serves no purpose but to allow the State to "suggest[ ] that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged."

*Mee*, 168 Wn. App. at 159 (alteration in original) (quoting *Foxhoven*, 161 Wn.2d at 175); *see also Bluehorse*, 159 Wn. App. at 431 (stating that testimony from police or other gang experts is insufficient, standing alone, to support a finding that the charged crime was gang related).

¶132 Here, the State failed to connect the defendants' gang affiliations with their alleged motives for committing the crime or with their alleged concerted actions. Accordingly, the gang evidence was irrelevant and inadmissible.

### A. Motive and Premeditation

¶133 For example, in *State v. Yarbrough*, 151 Wn. App. 66, 75-76, 80, 84-87, 210 P.3d 1029 (2009), we held that gang evidence was admissible to establish Yarbrough's motive and mental state where (1) Yarbrough was a Crips gang member; (2) Yarbrough perceived the victim as a member of a rival gang; (3) members of the gangs had identified

themselves in a confrontation four days earlier and a Crip threatened to open fire on the rival gang; (4) and Yarbrough shot the victim after uttering, " 'This is Hilltop Crip, cuz, what you know about that.' "

¶134 Similarly, in *State v. Campbell*, 78 Wn. App. 813, 815-17, 822-23, 901 P.2d 1050 (1995), we held that gang evidence was admissible to establish premeditation, motive, and intent where (1) Campbell was a Los Angeles Santana Blocc Crips gang member and a crack cocaine dealer; (2) the victims were members of a local Bremerton Crips gang who sold crack cocaine in the same location as Campbell; (3) Campbell and his partner, also a Los Angeles Crip, perceived the Bremerton Crips as inferior "wannabes"; (4) Campbell confronted the victims and threatened to kill them some time before their murder; (5) the night before the murders, Campbell and his partner discussed "fixing the wannabes"; and (6) while together after the murders, Campbell or one of his partners said, " 'I told you we were going to get those mother f[******]. I told you we was the baddest ones in Bremerton.' "

¶135 In both *Yarbrough* and *Campbell*, the State proved gang activity and gang talk just before, during, and after the shootings. It then presented expert testimony to explain the gang terminology, the gang's hierarchical structure, and its mores. In *Yarbrough*, 151 Wn. App. at 79-80, Detective Ringer testified about the importance of respect in gang culture, that gang members could earn and maintain respect by their willingness to use firearms, and that gang members accepted that other gangs could not show disrespect to their gang. In *Campbell*, 78 Wn. App. at 818, 822, expert testimony established that in gang culture, the rival gang member victims' displays of disrespect toward Campbell and intrusion on his drug selling turf were grounds for retaliation and murder.

¶136 But in *Scott*, 151 Wn. App. at 523-24, the trial court admitted evidence of Scott's gang affiliation based on the

State's offer that the evidence would establish that Scott's assault on the victim was motivated by her display of disrespect toward the gang. At trial, however, the State did not elicit from its gang expert witness the importance of respect in the gang's culture, the gang's beliefs about appropriate responses to disrespect, or "any connection between gang membership" and the assault. *Scott*, 151 Wn. App. at 525. Division Three of this court held that the trial court improperly admitted the gang affiliation evidence because the State failed to connect that evidence to the alleged motive for retaliating—disrespect shown to the gang. *Scott*, 151 Wn. App. at 528-29; *see also State v. Ra*, 144 Wn. App. 688, 701-02, 175 P.3d 609 (2008) (trial court improperly admitted evidence where the State presented no evidence on the gang's mores).

¶137 This case is more like *Scott* than *Yarborough* and *Campbell*. The State proved how gangs in general commit crimes. But it did not connect any gang activities or mores to the shooting of Clark; nor did it prove that Embry, Morgan, and Parker or their gangs embraced and followed the general gang standards. Without such evidence the State could argue, as it did here, only that the motive for the shooting *must* have been retaliation because the defendants are gang members and gang members retaliate; and that Morgan and Parker must have known what Embry intended and must have helped because that is what gang members do. But this is the precise inference that ER 404(b) prohibits: the defendant is guilty because he is a " 'criminal-type person.' " *Mee*, 168 Wn. App. at 159 (quoting *Foxhoven*, 161 Wn.2d at 175).

¶138 For the same reasons, the gang evidence was irrelevant to establish that Parker, Embry, and Morgan premeditated the crime. Although testimony about the January 1 nightclub fight involving Clark and Parker may have been relevant to establish Parker, Embry, and Morgan's shared, retaliatory motive for shooting Clark, the State tainted this evidence with gang evidence without establish-

ing its nexus to the crime. Because the trial court based its decision on facts that ultimately were not established in the record, it abused its discretion in admitting the gang evidence as proof of motive. *See Quismundo*, 164 Wn.2d at 504; *Scott*, 151 Wn. App. at 528-29 (reversing when evidence at trial failed to establish nexus).

## B. Res Gestae and Concerted Action

¶139 The trial court accepted the State's argument that the gang evidence was admissible to establish the relationship between Parker, Embry, and Morgan, and to show that they acted in concert. Evidence of prior bad acts may be admissible under the ER 404(b) res gestae exception to show the defendants' concerted acts. *State v. Lane*, 125 Wn.2d 825, 834-35, 889 P.2d 929 (1995); *State v. Boot*, 89 Wn. App. 780, 790, 950 P.2d 964 (1998).

¶140 In *Lane*, 125 Wn.2d at 835, three defendants were charged with murder, and the evidence suggested only one of them had shot the victim. Our Supreme Court held that evidence of a series of crimes the defendants committed together during the 48 hours before and after the murder was admissible under the res gestae exception to show that "when [the defendants] committed crimes, each one had a role to play and," thus, "each was in some manner responsible and accountable" for the murder. *Lane*, 125 Wn.2d at 835.

¶141 In *Boot*, 89 Wn. App. at 783, Boot and his cousin, Jerry, were charged with murder. Two nights before the murder, Boot put a gun to someone's head, but everyone present taunted him by saying he was "too much of a baby" to shoot the person. *Boot*, 89 Wn. App. at 785. Boot and Jerry then committed a series of crimes, during which Boot possessed, brandished, and used a firearm. *Boot*, 89 Wn. App. at 784-85. Division Three of this court held that this evidence, as well as evidence about gangs and of Boot's gang affiliation, was admissible under ER 404(b) as proof of motive and premeditation. *Boot*, 89 Wn. App. at 789-90.

When addressing the res gestae exception, however, Division Three did not mention the gang evidence, stating only:

> Boot and Jerry were codefendants. Evidence of the Boots' actions close in time and place to Ms. Reese's murder was necessary to show how they acted together. Their interaction was also probative of who was in possession of the gun and who used it. The evidence established an escalating chain of events of increasingly serious crimes in a short period of time. Its admission was necessary to permit the jury to get the whole picture and try to make some sense out of a senseless crime.

*Boot*, 89 Wn. App. at 790.

¶142 Unlike in *Lane* or *Boot*, here, the State presented no evidence that Parker, Embry, and Morgan committed a series of crimes shortly before the shooting. Thus, the State did not prove a pattern of recent criminal behavior that tended to prove the role of each defendant in the shooting. Furthermore, although Detective Ringer generally testified that gang members lend each other vehicles or firearms and the borrower will dispose of them if used in a crime, he did not testify that the Hilltop Crips; the Seattle or Tacoma Hoover Crips; or Parker, Embry, and Morgan adhered to any such tenets or behaviors, which would have connected such conduct to the shooting. *See Mee*, 168 Wn. App. at 159.

¶143 Although Detective Ringer testified that Hilltop Crips and Tacoma Hoover Crips had "worked together" in committing drug or "[p]roperty kind" of crimes, he could not recall them collaborating in a shooting or another violent crime. 8 RP at 1396-97. Moreover, he did not testify that their mores required or encouraged the two gangs to assist each other in committing such crimes or that Parker, Embry, and Morgan adhered to any such tenets. *See Mee*, 168 Wn. App. at 159; *Ra*, 144 Wn. App. at 701-02.

¶144 Finally, Detective Ringer testified that Embry and Morgan were members of Seattle Hoover Crips gangs, the Seattle and Tacoma Hoover Crips were "separate and distinct," Detective Ringer's focus was not on King County

gangs, and he had not studied specific Hoover Crips gang affiliations. 8 RP at 1394-95, 1463-64. Accordingly, Detective Ringer's testimony about Hoover Crips was not relevant to Seattle Hoover Crips, the gangs actually involved in this case. *See Asaeli*, 150 Wn. App. at 566, 578-79 (gang expert's testimony neither relevant nor helpful to jury when expert's experience predominately involved African-American gangs, expert did not testify to knowledge about Samoan gangs, and case involved a Samoan gang).

¶145 In the absence of testimony explaining why Hilltop or Hoover Crips gang culture might require or encourage Parker, Embry, and Morgan to commit this shooting, the gang evidence again suggested only the forbidden inference: some gang members lend each other firearms and vehicles and commit some crimes together; Parker, Embry, and Morgan were gang members; therefore, they worked together in committing this shooting. *See Foxhoven*, 161 Wn.2d at 175. Although the photographs depicting Embry and Morgan and Embry and Parker together were relevant to show they knew each other and may have acted together as friends,[17] the State tainted this evidence with gang evidence whose relevancy was ultimately unsupported by the evidence. *See Quismundo*, 164 Wn.2d at 504; *Scott*, 151 Wn. App. at 528-29.

## III. INSUFFICIENT PROBATIVE VALUE

¶146 Even if the gang evidence was relevant for an admissible purpose, its prejudicial effect outweighed its probative value. In balancing the evidence's probative value against its prejudicial effect under ER 404(b), the trial court must read ER 404(b) in conjunction with ER 403. *State v. Smith*, 106 Wn.2d 772, 775, 725 P.2d 951 (1986); *Mee*, 168 Wn. App. at 154. "ER 403 requires exclusion of

---

[17] Detective Ringer testified about the photographs without remarking on or explaining the gang signs being flashed by those depicted. The State could have sought admission of the photographs at trial with the gang signs obscured or, at least, used them at trial without any reference to gangs.

evidence, *even if relevant*, if its probative value is substantially outweighed by the danger of unfair prejudice." *Smith*, 106 Wn.2d at 776; *see also Mee*, 168 Wn. App. at 154 (stating the same).

¶147 For all the above reasons, any connection between Parker's, Embry's, and Morgan's gang affiliations and Clark's shooting was attenuated and speculative at best. And Detective Ringer's testimony about gang culture and behavior in general told the jury nothing about the Seattle Hoover Crips and the Tacoma Hilltop Crips, the gangs actually involved in this case. As we held in *Mee*, 168 Wn. App. at 159, such generalized evidence, absent "evidence showing adherence by the defendant or the defendant's alleged gang to those behaviors . . . serves no purpose" other than suggesting the propensity arguments forbidden by ER 404(b). *See also Asaeli*, 150 Wn. App. at 579 (gang expert's testimony "not probative due to its general and conclusory nature"). Accordingly, the trial court abused its discretion in admitting the gang evidence because the danger of unfair prejudice substantially outweighed its probative value. *Accord Mee*, 168 Wn. App. at 159.

## IV. Harmless Error

¶148 I would also hold that admitting the gang evidence was harmful with respect to Parker's and Morgan's convictions and Embry's conviction of conspiracy to commit first degree murder. The erroneous admission of evidence under ER 404(b) "requires reversal only if the error, within reasonable probability, materially affected the outcome of the trial." *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993).

¶149 Here, Parker's and Morgan's convictions for attempted first degree murder and first degree unlawful possession of a firearm were based on accomplice liability. Under RCW 9A.08.020(3)(a)(i)-(ii), an accomplice is one who, "[w]ith knowledge that it will promote or facilitate the

commission of the crime, . . . encourages . . . or . . . [a]ids" another person in committing a crime. Mere presence during and assent to a crime is insufficient to show accomplice liability. *State v. McDaniel*, 155 Wn. App. 829, 863, 230 P.3d 245, *review denied*, 169 Wn.2d 1027 (2010). Instead, the defendant must have associated himself with the criminal conduct, participated in the criminal conduct, and sought to make the crime successful by his actions. *State v. Robinson*, 73 Wn. App. 851, 855, 872 P.2d 43 (1994) (citing *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979)). An accomplice does not have to have specific knowledge of every element of the crime, but must have general knowledge of the specific substantive crime committed. *State v. Roberts*, 142 Wn.2d 471, 512-13, 14 P.3d 713 (2000); *State v. Sweet*, 138 Wn.2d 466, 479, 980 P.2d 1223 (1999).

¶150  Here, without the gang evidence, the State proved only that Parker, Embry, and Morgan interacted at McCabe's; Embry had some contact with Clark; when Clark exited the nightclub, Embry and Morgan jogged off in the direction where the shooting occurred; witnesses saw individuals matching Embry's and Morgan's descriptions getting into a vehicle similar to Parker's car; Parker shortly thereafter reported his car stolen; and the car was later found in the Green River.

¶151  Although this evidence may have suggested that Parker and Morgan encouraged or aided Embry in the assault of Clark, I am satisfied that there is a reasonable probability the jury would have reached a different result without the prejudicial gang evidence. Indeed, the State's closing argument exhorted the jurors to ask themselves where, "other than the gang world," would three acquaintances agree to murder someone. 11 RP at 1772. Again, the State was simply urging the jury to make the forbidden inference that the defendants must be guilty because they are gang members. *See Mee*, 168 Wn. App. at 159; *Wade*, 98 Wn. App. at 336. I would reverse Parker's and Morgan's convictions and remand for further proceedings.

¶152 Likewise, under RCW 9A.28.040(1),

> A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

The subject crime of the conspiracy is an element of the crime. *State v. Stark*, 158 Wn. App. 952, 962, 244 P.3d 433 (2010) (citing *State v. Smith*, 131 Wn.2d 258, 262-63, 930 P.2d 917 (1997)). The subject crime of the conspiracy alleged here is attempted first degree murder. Thus, the State had to prove that Embry, Morgan, and Parker agreed to attempt the murder of Clark. *Accord Stark*, 158 Wn. App. at 962.

¶153 The State presented no direct evidence of such an agreement, offering instead the equivocal evidence of the defendants' conduct at the nightclub and the improperly admitted evidence that they were gang members who likely would agree to participate in such a shooting. As discussed above, I would hold that the gang evidence materially affected Embry's trial for conspiracy requiring that we reverse his conspiracy conviction and remand for further proceedings.

¶154 But, because Clark and his companion identified Embry as the shooter, the gang evidence was harmless as to Embry's convictions for attempted first degree murder and first degree unlawful possession of a firearm.

¶155 As Washington courts have observed, it is a fundamental principle of American criminal law that a jury should be "confine[d] . . . to the merits of the current case in judging a person's guilt or innocence." *Wade*, 98 Wn. App. at 336. Here, there is too great a risk that the jury convicted Embry, Morgan, and Parker based on irrelevant and prejudicial evidence of their gang affiliations and generalized gang testimony, as opposed to evidence of their actions on the night of Clark's shooting. For all the above reasons, I dissent.

Motions for reconsideration denied December 6, 2012 and January 22, 2013.

Review denied at 177 Wn.2d 1005 (2013).