# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49933-9-II |
| Respondent/Cross Appellant, | |
| v. | |
| ALEX QUINTANA, JR., | UNPUBLISHED OPINION |
| Appellant/Cross Respondent. | |

WORSWICK, J. — Alex Quintana Jr. appeals his convictions of second degree assault, drive-by shooting, and first degree unlawful possession of a firearm.  Quintana argues that (1) the evidence was insufficient to prove second degree assault and drive-by shooting; (2) he was provided ineffective assistance of counsel because his trial counsel did not move for a mistrial after voir dire, did not move to suppress or exclude gang related evidence, and did not request a limiting instruction for the gang related evidence; and (3) the trial court violated the appearance of fairness doctrine when it interrupted a witness's incriminating statement and defense counsel's motion to dismiss.

We hold that there was sufficient evidence to support Quintana's convictions and that Quintana was provided effective assistance from his trial counsel.  We do not reach the question of whether the trial court violated the appearance of fairness doctrine.  Consequently, we affirm Quintana's convictions.

FACTS

Erica Osorio-Heaton and her boyfriend Christopher Jones lived along Ocean Beach Highway in Longview, Washington. Early one morning, Osorio-Heaton received a phone call from Alex Quintana Jr. Before handing the phone to Jones, Osorio-Heaton heard Quintana say something like, "See you later sweetheart." A Verbatim Report of Proceedings (VRP) (Dec. 7, 2016) at 147.

That afternoon, Jones and Osorio-Heaton got into their car to run an errand. Jones recalled that both he and Osorio-Heaton were inside the car with the doors closed. Osorio-Heaton recalled that she was partially in the car on the passenger side with one leg in and one leg out. The car was parked in the driveway, facing away from the highway. They heard a person shout, "showoo," followed by three gunshots in quick succession. A VRP (Dec. 7, 2016) at 149. Neighbors of Jones and Osorio-Heaton also heard three pops but did not see any vehicles or hear any shouts.

Jones did not immediately turn around when the shots were fired, but did see an SUV (sport-utility vehicle) which he recognized as belonging to William Johnson driving away. He did not identify the person who shouted or anyone in the vehicle.

In response to the shots, Osorio-Heaton put her entire body in the car, ducked down, and then immediately called 911. Osorio-Heaton told the 911 operator that she saw Johnson driving the SUV and Quintana in the back driver's side of the SUV with a gun in his hand. Osorio-Heaton saw that Quintana was wearing a black shirt and identified him as the person with the gun who shouted "showoo." Osorio-Heaton later stated that she did not actually see who was driving the SUV.

2

Law enforcement responded to Osorio-Heaton's 911 call. After exiting the SUV at a friend's house and fleeing the area on foot, Quintana was apprehended along with two others, Johnson and Noah Custer. When arrested, Quintana was wearing a white T-shirt and white Converse All Stars. He also had two black and red bandanas. Law enforcement found Converse shoe prints in the area where the group had fled. The group was seen wearing red clothing. After his arrest, Quintana shouted the "showoo" call multiple times. Johnson shouted the "showoo" call as well.

The State charged Quintana with two counts of first degree assault (Counts I and II), one count of drive-by shooting (Count III), and one count of first degree unlawful possession of a firearm (Count IV).

During jury selection, potential juror 43 gave two extended responses about his displeasure at being called for jury duty. He stated that regardless of the trial proceedings, he would vote a defendant guilty. He further stated that instead of providing repeat offenders due process, society should "hang 'em." A VRP (Dec. 7, 2016) at 49. Following this, potential juror 35 expressed that the judicial system is broken and that defense attorneys aim to have guilty individuals released on technicalities. Potential juror 34 echoed a negative opinion of defense attorneys. Neither 43 nor 35 were chosen to sit on the jury. Potential juror 34 was chosen as an alternate juror, but was excused for sleeping during the second day of trial.

At trial, witnesses testified to the above facts. However, trial testimony conflicted as to whether or how many other individuals were involved in the shooting but not arrested.

Law enforcement searched the SUV, and found red, black, and tan clothing and a piece of notebook paper with a purported Norteno gang creed written on it. They also found a cell phone and a .40 caliber shell casing.

Law enforcement investigated the scene for evidence of the shooting, and found a bullet fragment lodged in the roof of Jones and Osorio-Heaton's home. The portion of the roof containing the bullet was on the side nearest the driveway. The bullet tear in the roof appeared to be a "relatively-fresh mark." VRP (Dec. 8, 2016) at 152. However, the hole in the roof appeared to have been made by a bullet smaller than a .40 caliber bullet.

Photographs showing where the bullet was in the roof were admitted as exhibits 31-36. Photographs and measurements of approximately where the SUV was located on the highway when the shots were fired were also admitted. One photograph, admitted as exhibit 2, showed an individual standing near Jones's vehicle holding a tape measure and giving the perspective of what the shooter in the SUV saw when firing toward Jones and Osorio-Heaton. Another photograph, admitted as exhibit 3, depicted a close up of the tape measure. These two photographs together showed a tape measure distance of "a hundred feet" between Jones's vehicle and approximately where the SUV would have been. VRP (Dec. 8, 2016) at 33.

Another photograph, admitted as exhibit 6, depicted a view of Jones and Osorio-Heaton's house from of the center lane of Ocean Beach Highway near where the shots were fired from the SUV. These photographs were specifically taken to show the angles of where the SUV was believed to be in relation to the house during the shooting. Another photograph, admitted as exhibit 18, showed the same individual with the measuring tape from Ocean Beach Highway.

4

In addition, the jury heard testimony that Ocean Beach Highway is at a higher elevation than the home. And Detective Calvin Ripp testified that bullets are capable of significantly injuring or killing humans.

Jones testified that he had previously been a member of a gang, the Nortenos, with Quintana and others but had been expelled after he had sexual relations with other members' girlfriends. He further testified about the loyalty of Norteno members and how one member's dislike of someone can mean that the entire group dislikes that person.

Johnson testified that he was driving the SUV and that Quintana was in the front passenger seat. There were two individuals[1] in the back seat. Johnson did not believe anyone was armed. He heard the "showoo" call and three shots fired from the back seat. Johnson said that Quintana did not shout the "showoo" call or fire the three shots.

Quintana also testified. Quintana testified that he was wearing a white shirt and Converse shoes, and that he was in the front passenger seat of the SUV. He heard someone in the backseat shout "showoo" and then fire three shots. According to Quintana, this individual fired at Jones and Osorio-Heaton because Jones had slept with the shooter's girlfriend. On cross-examination, Quintana testified that he, Johnson, Custer, and Justice Arquette were current Norteno members and that Jones was a former member. Quintana's counsel did not object to the prosecutor's questions eliciting this information.

Longview Police Department Detective Jordan Sanders testified regarding the Norteno gang activity in Longview. He testified that Quintana was associated with the Norteno gang. He further testified about codes of conducts for gangs, including that when one gang member

---

[1] These individuals were not specifically identified at trial.

dislikes a person, the entire gang also dislikes that person. He stated that Nortenos wore red clothing or bandanas and Converse shoes and shouted "showoo." Longview Police Department Sergeant Christopher Blanchard testified that Converse shoes are commonly affiliated with gangs. Further, Longview Police Department Officer Luis Hernandez stated that gang members "like to wear baggy garments. Not all of 'em, but, you know, for the most part they don't wear a tailored suit when they're a gang banger." C VRP (Dec. 9, 2016) at 68. Quintana's counsel did not object to this gang related testimony.

Quintana called Arquette as a witness. In response to the first question asked, Arquette stated, "I was told by my attorney not to answer any questions." C VRP (Dec. 9, 2016) at 114. Quintana's trial counsel then asked another question and Arquette began to answer a series of inquiries. Further into the questioning Arquette again stated he would not be answering questions, this time stating he was "[p]leading the Fifth." C VRP (Dec. 9, 2016) at 118.

The trial court excused the jury from the courtroom. The court and both counsel discussed what Arquette might testify to and if indeed his answers would be incriminating. Quintana's counsel contended that if Arquette testified consistent with his prior statements, namely that he was not the gunman nor was he involved in the incident, then Arquette could continue to testify because he would not incriminate himself. The court then addressed Arquette. The following exchange occurred:

> THE COURT: Well, whether or not you can refuse to answer the question kind of depends on what your response is going to be. So, are you going to testify consistent with what you told the detective, or not?
> [ARQUETTE]: Yes.
> THE COURT: Pardon?
> [ARQUETTE]: Yes.
> THE COURT: All right.

Then based on what you're telling me, your testimony would be that you didn't have anything to do with that; is that correct?
[ARQUETTE]:    Yes.
THE COURT:    All right.
So, based on that, you don't have a Fifth Amendment right not to answer those questions; you understand that?
[ARQUETTE]:    I—I'm the one that pulled the trigger. He (witness pointing from stand) shouldn't even be in here for this charge. Plain and simple, it was me who pulled the trigger. The phone—
THE COURT:    Okay, let me stop you—
[ARQUETTE]:—that was my phone.
THE COURT:—right there a second.
We're going to take a break. We're going to get [Arquette's attorney] over here . . . .

C VRP (Dec. 9, 2016) at 121-22. After a brief recess, the proceedings resumed. Arquette's

attorney telephoned in and stated that Arquette was indeed invoking his Fifth Amendment

privilege against self-incrimination. Both the State and Quintana's counsel requested to ask

Arquette further questions but the trial court determined that Arquette would not be subject to

any more questioning and released him from the stand.

The State moved to strike the entirety of Arquette's testimony because it was not given

the opportunity to cross-examine him. The court determined that Arquette's incriminating

statement was admissible under ER 804(b)(1) and (3) because Arquette was an unavailable

declarant and this statement was both former testimony and against his interest. A recording of

Arquette's testimony was admitted and then played for the jury.

Prior to Arquette's testimony, Quintana's counsel moved to dismiss all charges noting

that "the prima facie element of a proper and correct and unequivocal identification as the person

seen in that car that day has [not] been established." C VRP (Dec. 9, 2016) at 107. The court

denied the motion based on Osorio-Heaton's identification of Quintana. During the commotion

regarding Arquette's testimony, Quintana's counsel moved for a dismissal based on Arquette

7

confessing under oath to the crimes charged. The court interrupted Quintana's counsel to begin addressing the list of issues raised with Arquette's statement. The court did not address this issue until Quintana's counsel again moved for a dismissal later in the proceedings. Quintana's counsel argued that there was insufficient evidence to send the matter to a jury, citing Osario-Heaton's identification testimony and Arquette's incriminating statement. He argued that even taking the evidence in a light most favorable to the State, no reasonable jury could find Quintana guilty beyond a reasonable doubt. The trial court determined there was enough evidence for the case to go to the jury.

During closing arguments, Quintana's counsel stated that the Converse shoes, identified by their print on the trail, could have been worn by someone other than Quintana, and that the "showoo" call could not be specifically attributed to Quintana. He also discussed the concept of gang loyalty to explain why witnesses testified the way they did.

The jury found Quintana not guilty of first degree assault for Counts I and II. However, Quintana was found guilty of second degree assault for Counts I and II. Further, he was found guilty as charged of drive-by shooting on Count III and first degree unlawful possession of a firearm on Count IV.

Quintana appeals.[2]

---

[2] The State cross appeals arguing the trial court erred when it denied the State's motion to strike the entirety of Arquette's testimony. Because all of Quintana's arguments fail, we hold the issue on cross appeal is moot. Accordingly, we do not address it.

## ANALYSIS

### I. INSUFFICIENT EVIDENCE

Quintana makes several arguments contending that insufficient evidence supports his convictions. We disagree.

Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt. *State v. Longshore*, 141 Wn.2d 414, 420-21, 5 P.3d 1256 (2000). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Such inferences must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). We defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014). Circumstantial evidence is not any less reliable or probative than direct evidence in reviewing the sufficiency of the evidence supporting a jury verdict. *Kintz*, 169 Wn.2d at 551.

A.    *Counts I and II: Second Degree Assault*

Quintana argues there is insufficient evidence to prove he met the necessary elements for second degree assault. Specifically, Quintana argues that the State failed to prove (1) the specific intent to cause fear or apprehension of bodily injury in Osorio-Heaton and Jones for Counts I and II, (2) the fear or apprehension of Jones for Count I, and (3) that Quintana knew there were people in the vehicle for Counts I and II. We disagree.

1. *Specific Intent of Quintana*

Quintana contends the State failed to prove the required specific intent for second degree assault with a deadly weapon. He argues that the specific intent required here was the intent to cause fear and apprehension of injury and that the State failed to present evidence to his state of mind.

Common law definitions of assault listed in a jury instruction are not alternative means for committing the crime, but rather define an element of the crime. *State v. Smith*, 159 Wn.2d 778, 786-87, 154 P.3d 873 (2007). Because definitions of an element are not alternative means, there need not be evidence to support every definition of the assault element of a crime. *Smith*, 159 Wn.2d at 786-87; *see also State v. Owens*, 180 Wn.2d 90, 96, 323 P.3d 1030 (2014); *State v. Makekau*, 194 Wn. App. 407, 411-12, 378 P.3d 577 (2016).

In *Smith*, the jury was given a separate definitional instruction of common law assault with three definitions. *Smith*, 159 Wn.2d at 781-82. There, the Supreme Court held that "the common law definitions of 'assault' merely explain the assault by means of a deadly weapon alternative and, therefore, [do not] have to be supported by substantial evidence on the record." *Smith*, 159 Wn.2d at 788.

To convict Quintana of second degree assault on Counts I and II, jury instruction 15 and 16 required proof beyond a reasonable doubt that Quintana intentionally assaulted Jones (Count I) and Osorio-Heaton (Count II) with a deadly weapon in the State of Washington. The court provided the jury with three different definitions of assault in jury instruction 10. Jury instruction 10 defined assault as:

> [(1)] an intentional touching or striking of another person, with unlawful force, that is harmful or offensive[,]

[(2)] an act, with unlawful force, done with the intent to inflict bodily injury upon another person, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented[,] and

[(3)] an act with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 114.

Similar to *Smith*, jury instruction 10 did not require the jury to find Quintana's actions met all three definitions of assault to find he committed the crime. *See Smith*, 159 Wn.2d at 786-87. Rather, the jury could have found Quintana committed an assault if his actions fit *any* of the definitions of the element of assault. *See Smith*, 159 Wn.2d at 786-87. As a result, the State was not required to prove Quintana specifically intended to cause apprehension or fear in Osorio-Heaton or Jones. The State could have proved instead that Quintana acted with unlawful force with the intent to inflict bodily injury on another.

After Jones was expelled from the Nortenos for sleeping with members' girlfriends, the group, which included Quintana, expressed a dislike for Jones. Osorio-Heaton testified that Quintana was the shooter and that he fired three shots in the direction of Jones and Osorio-Heaton. Further, Osorio-Heaton's testimony that Quintana shot toward Osorio-Heaton and Jones three times showed a specific intent to inflict bodily injury. When viewed in a light most favorable to the State, the prosecution presented evidence that a reasonable jury could have found Quintana had the requisite intent under at least one definition of assault provided in jury instruction 10. As such, we hold that Quintana's claim that he did not possess the requisite intent for second degree assault fails.

11

2. *Jones's Fear and Apprehension*

Quintana also argues that the State failed to prove he assaulted Jones because there is insufficient evidence that Quintana caused Jones to have fear and apprehension of bodily harm. We disagree.

Quintana correctly points out that the record lacks direct testimonial evidence of Jones's fear or apprehension. However, such proof was not required under the facts and circumstances of this case. Circumstantial evidence proves Jones's apprehension. Jones heard the "showoo" call and the gunshots. He knew that members of the Nortenos did not like him. He also testified that he was "[k]ind of shocked" by the gunshots. B VRP (Dec. 7, 2016) at 203. Additionally, any reasonable person would understand that gunshots can kill you. Taken in a light most favorable to the State, circumstantial evidence showed Jones's fear or apprehension.

Further, to find Quintana guilty of assault, the jury did not necessarily have to find that Jones was apprehensive and fearful of bodily injury. *See Smith*, 159 Wn.2d at 786-87. Instead, under an alternate definition of assault, the jury could have found an assault occurred when there was an act of unlawful force done with the intent to inflict bodily injury accompanied by the present ability to inflict such bodily injury. *See Smith*, 159 Wn.2d at 786-87. There was ill will between the Nortenos, of which Quintana was a member, and Jones after Jones was kicked out of the group. Further, Quintana shot toward Osorio-Heaton and Jones three times, not just once. This evidence, taken in a light most favorable to the prosecution, would allow a reasonable jury to find Quintana guilty of second degree assault against Jones.

12

3. *Failure To Prove People Were in Vehicle*

Quintana also argues that the State failed to prove that the shooter was aware people were in the vehicle when the gun was fired. Specifically, he contends "there was no evidence that Mr. Quintana knew either Mr. Jones or Ms. Osorio-Heaton were in the Camry. Thus, the conviction for second degree assault in Counts I and II should be reversed for insufficient evidence of specific intent to assault either of them." Br of Appellant at 37-38. We disagree.

Quintana's testimony shows he knew Osorio-Heaton and Jones were in the car when the shots were fired from the SUV. On direct examination, Quintana said he just went out to have a good day and was mad that the individual shot at two people he considered his friends. His counsel asked, "Do you have any idea why that person fired at Chris and Erica?" and Quintana said, "Yeah. . . . Because he was mad that Chris had sex with his girl." C VRP (Dec. 9, 2016) at 176. Taking the evidence in a light most favorable to the State and all inferences therefrom, Quintana's testimony shows he knew that Osorio-Heaton and Jones were shot at. Quintana misrepresents the record by arguing that the State presented no evidence that he knew Osorio-Heaton and Jones were in their vehicle when the shots were fired.

Moreover, Osorio-Heaton testified she was partially in the vehicle with the door open when the shots were fired. The jury saw photographs and heard testimony accompanying them regarding the distance between the lanes of traffic on Ocean Beach Highway. This included a view of a person standing by the vehicle, providing the jury with perspective of what the shooter in the SUV saw when firing toward Jones and Osorio-Heaton (exhibit 2). Viewing the exhibits, we hold that a jury would be able to reasonably infer that a shooter from that distance would be able to see Osorio-Heaton and Jones in the car. Taking all evidence and reasonable inferences in

13

the light most favorable to the State, we hold that sufficient evidence supports Quintana's

convictions for both counts of second degree assault.

B.      *Count III: Drive-by Shooting*

As to Count III, Quintana argues that the State failed to prove a substantial risk of death

or serious physical injury to another. We disagree.

To prove Count III, the State needed to show Quintana (1) recklessly discharged a

firearm, (2) creating a substantial risk of death or serious physical injury to another person, (3)

that the discharge was from a vehicle or the immediate area of a vehicle, and (4) the act occurred

in the State of Washington.

Quintana contests only the second element: creating a substantial risk of death or serious

physical injury to another person. Specifically, he argues that the State did not prove the bullets

were fired at Jones and Osorio-Heaton, so there was no substantial risk of death or serious injury.

Here, taking the evidence in a light most favorable to the State, a reasonable jury could have

found that there was a substantial risk of death or serious injury to another. The State presented

evidence of at least one bullet remnant in the roof of the house that was "relatively-fresh." VRP

(Dec. 8, 2016) at 152. Further, the State presented photographic evidence of approximately

where the vehicle was in relation to the house and car when the shots were fired.

Viewing exhibit 2 (depicting the perspective from where the SUV shot toward the house)

with exhibits 31 and 32 (depicting the portion of the roof where the bullet was found), the jury

could have reasonably concluded that the bullet in the roof came from the SUV. Further, the

jury could have concluded that the bullet's location in the roof showed that Quintana fired in the

direction of Jones and Osorio-Heaton. Detective Ripp testified to the dangerousness of bullets

14

and their ability to kill humans. Taking the evidence in a light most favorably to the State, this indicates that at least one shot was fired in the direction of Osorio-Heaton and Jones. From the evidence presented, a reasonable jury could find that firing a gun from a moving vehicle toward a residence with people nearby creates a substantial risk of death or serious physical injury.

C.      *Identifying Quintana as the Shooter*

Quintana argues that the evidence did not prove his identity as the shooter. We disagree.

Quintana argues that (1) Osorio-Heaton's testimony conflicted with her earlier statements, (2) no physical evidence links Quintana to the SUV, (3) no gunshot residue evidence was collected from Quintana showing a recent discharge of a weapon, (4) a suspect seen by Officer Bessman at the time of the arrests disappeared and was never apprehended, (5) Arquette's iPhone was in the SUV, (6) the shooter was described by Ms. Osorio-Heaton as wearing a black T-shirt and that he was wearing a white T-shirt when arrested, (7) clothing recovered during the warrant search of the SUV was not linked to Quintana, and (8) Justice Arquette stated under oath that he was the shooter and that Quintana was not involved.

In determining whether sufficient evidence supports a conviction, we construe the evidence and inferences therefrom strongly in the State's favor. *Kintz*, 169 Wn.2d at 551. Further, we defer to the jury to make determinations on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *Andy*, 182 Wn.2d at 303. Quintana's arguments concerning the identity of the shooter go to the jury's determinations regarding credibility and the weight of the evidence. We hold that, when viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State

sufficiently identified Quintana as the shooter. As such, there was sufficient evidence to find

Quintana guilty of two counts of second degree assault and one count of drive-by shooting.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the United States Constitution and article I, section 22 of the

Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d

17, 32, 246 P.3d 1260 (2011). We review ineffective assistance claims de novo. *State v.*

*Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prove that he received ineffective

assistance of counsel, a defendant must show (1) that defense counsel's conduct was deficient

and (2) that the deficient performance resulted in prejudice. *State v. Linville*, 191 Wn.2d 513,

524, 423 P.3d 842 (2018). Because both prongs must be met, a failure to show either prong will

end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

To establish deficient performance, the defendant must show that trial counsel's

performance fell below an objective standard of reasonableness. *State v. Estes*, 188 Wn.2d 450,

458, 395 P.3d 1045 (2017). Trial strategy and tactics cannot form the basis of a finding of

deficient performance. *State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001). Counsel

is not deficient for failing to make requests that would be unsuccessful. *See State v. Denny*, 173

Wn. App. 805, 811, 294 P.3d 862 (2013). To establish prejudice, the defendant must show a

reasonable probability that, absent counsel's unprofessional errors, the result of the proceeding

would have been different. *Estes*, 188 Wn.2d at 458.

There is no ineffective assistance when counsel's complained of actions are trial tactics

or go to the theory of the case. *Grier*, 171 Wn.2d at 33. We strongly presume that defense

counsel's conduct was not deficient. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012).

16

Because of this presumption, "a 'defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Emery*, 174 Wn.2d at 755 (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)). A criminal defendant will not prevail on an ineffective assistance claim where no "evidence on counsel's strategic or tactical decisions was presented in the courts below." *Linville*, 191 Wn.2d at 525.

To show counsel was ineffective for failing to object, a defendant must show that an objection would have been sustained. *See In re the Pers. Restraint of Davis*, 152 Wn.2d 647, 748, 101 P.3d 1 (2004). Where the defendant claims ineffective assistance based on counsel's failure to challenge the admission of evidence, the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the failure to object, (2) that an objection likely would have been sustained, and (3) that the trial's result would have differed had the evidence not been admitted. *McFarland*, 127 Wn.2d at 336-37; *State v. Hendrickson*, 129 Wn.2d 61, 80, 917 P.2d 563 (1996).

A.      *Failure To Move for Mistrial During Jury Selection*

Quintana argues that his right to a fair trial was violated when his trial counsel did not move for a mistrial or dismissal during voir dire. Specifically, he argues that the inflammatory statements of jurors 34, 35, and 43 irreparably tainted the resulting jury's impartiality and presumptively prejudiced Quintana's trial. We disagree.

Article I, section 22, of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantee a right to a fair trial with an impartial jury. *State v. Strange*, 188 Wn. App. 679, 685, 354 P.3d 917 (2015). Due process requires that the defendant be tried by a jury willing to decide the case solely on the evidence admitted at trial. *Smith v. Phillips*,

17

455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). We review constitutional claims de novo. *Strange*, 188 Wn. App. at 685. A potential juror's biased remarks against criminals in the presence of the venire panel does not necessarily taint the jury. *See Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997); *Strange*, 188 Wn. App. at 685-86. When determining whether a potential juror's statements taint the venire panel and thus violate a defendant's right to an impartial jury, courts have considered a number of factors, including the expertise of the potential juror in relation to the statement, the number of statements or the amount of times a statement is repeated, the certainty of the statement, and the nature or relation of the statement to the crimes charged. *Mach*, 137 F.3d at 633; *Strange*, 188 Wn. App. at 684-87; *U.S. v. Kirby*, 692 F. App'x 334, 337 (9th Cir. 2017).

In *Mach*, a social worker tainted the venire panel with her statements regarding child molestation in a trial for sexual misconduct with a minor. *Mach*, 137 F.3d at 633. The social worker had taken courses on child psychology, associated with others in the field, worked as a social worker with children for three years, and made four separate statements during voir dire that she had never worked on a case where a child lied about being sexually abused by an adult. *Mach*, 137 F.3d at 633. The Ninth Circuit stated that "[g]iven the nature of [the social worker's] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times they were repeated," it presumed at least one juror had been tainted. *Mach*, 137 F.3d at 633.

Conversely, we held the venire panel was not tainted when the prospective jurors did not claim any expertise or make statements with certainty. *Strange*, 188 Wn. App. at 686-87. There, the defendant was charged with second degree child molestation and voyeurism. *Strange*, 188

18

Wn. App. at 681. One prospective juror stated that he didn't "have a ton of experience," but if a child made accusations of this nature, "there had to be something that had happened." *Strange*, 188 Wn. App. at 682. Additionally, two of the prospective jurors were schoolteachers and one was an elementary school principal. *Strange*, 188 Wn. App. at 686. Some prospective jurors admitted potential bias, but most stated they could follow the court's instructions. *Strange*, 188 Wn. App. at 687. Importantly, none of the prospective jurors spoke authoritatively about children alleging molestation, nor did the potential jurors assert the truthfulness of children alleging abuse. *Strange*, 188 Wn. App. at 686-87. Unlike *Mach*, these prospective jurors did not rely on their experience or credentials to add weight to unequivocal statements on the truthfulness of children alleging abuse. Accordingly, we held that the defendant received a fair trial by an impartial jury. *Strange*, 188 Wn. App. at 687.

Here, potential juror 43 gave two extended responses about his displeasure being called for jury duty. He stated that regardless of the trial proceedings, he would vote a defendant guilty. He further stated that instead of providing repeat offenders due process, those individuals should just be hanged. Following this, potential juror 35 expressed that the judicial system is broken and that defense attorneys aim to have guilty individuals released on technicalities. Potential juror 34 echoed a negative opinion of defense attorneys. Neither 43 nor 35 were chosen to sit on the jury. Potential juror 34 was chosen as an alternate juror, but was excused for sleeping during the second day of trial.

Potential jurors 34, 35, and 43 did not assert expertise regarding their statements, but rather gave generalized opinions about our justice system, those charged with crimes, and defense attorneys. None of these jurors ended up in the group of twelve who rendered a verdict.

19

Their statements were not specific to drive-by shootings or assault crimes and none spoke from a position of authority. Their negative generalizations go to the core of why voir dire is conducted in the first place—to root out those with prejudices that might affect the fairness of the proceedings. We hold that Quintana's case was adjudicated before an impartial jury.

Because trial counsel would not have been successful if he had brought a motion for a mistrial, the failure to bring that motion cannot be the basis for deficient performance. Further, because a motion for a mistrial would have been denied and the result of the trial would not have changed, the failure to raise it cannot act as prejudice against Quintana. Quintana has shown neither deficient performance nor prejudice. Accordingly, we hold that the failure to move for a mistrial was not ineffective assistance of counsel.

B.    *Gang Related Evidence*

Quintana argues that trial counsel's failure to object to gang related evidence or present a motion in limine to exclude any gang related evidence constituted ineffective assistance of counsel. Further, he argues that trial counsel's failure to propose a limiting instruction regarding gang related evidence amounted to ineffective assistance of counsel. We disagree.

1. *Failure To Object or Propose a Motion in Limine for Gang Related Evidence*

Quintana argues that his counsel was ineffective for failing to object to gang related evidence. We disagree.

To show his trial counsel was ineffective for failing to object, Quintana must show that an objection to gang related evidence would have been sustained. *See Davis*, 152 Wn.2d at 748. For gang related evidence to be admissible, there must be a nexus between the crime alleged and the gang membership. *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050 (1995).

Evidence of other crimes, wrongs, or acts fall within the scope of ER 404(b) and are not admissible to show propensity or conformity, but are admissible for other purposes, such as identity, intent, plan, preparation, or motive. *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009); *State v. Embry*, 171 Wn. App. 714, 732, 287 P.3d 648 (2012).

Quintana contends the gang related evidence was admitted to show propensity, which violates ER 404(b). However, the evidence tended to prove motive, intent, and identity. The shooting and the Nortenos were connected, and the gang evidence tended to prove motive and intent for the shooting. Jones was kicked out of the Nortenos for violating gang rules. Admission of testimony on the Norteno "showoo" call tended to show identity. Detective Sander's testimony further emphasized the connection between the Nortenos and Quintana's alleged crime. Testimony on the dynamics and inner workings of the Nortenos went to motive and identity. Thus, the gang evidence was admissible through the exception in ER 404(b). As such, Quintana fails to show that an objection likely would have been sustained.

Moreover, the record shows that defense counsel's failure to object to gang evidence was tactical. Quintana's counsel elicited gang related testimony throughout the trial. In closing argument, Quintana's counsel stated that the Converse shoes identified by their print on the trail could have been worn by someone other than Quintana, that the "showoo" call could not be attributed specifically to Quintana, and that the concept of gang loyalty explained why witnesses testified the way they did.

Quintana fails to show that an objection would have been sustained, or that trial counsel's failure to object was not tactical. As such, we hold that counsel's performance as to the admission of gang related evidence was not deficient and that Quintana's claim fails.

2. *Failure To Request a Limiting Instruction for Gang Evidence*

Quintana further argues his trial counsel was ineffective for failing to request a limiting instruction for gang related evidence. Specifically, he argues that even if gang related evidence was admissible for some purposes, without a limiting instruction, the jury was free to convict Quintana based on his gang membership rather than evidence identifying him as the shooter. We hold that Quintana has not shown that counsel was deficient on this record.

To establish ineffective assistance of counsel, Quintana must show that his trial counsel's performance was both deficient and prejudicial. *Linville*, 191 Wn.2d at 524. Because of the strong presumption of effective assistance, Quintana must "'show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Emery*, 174 Wn.2d at 755 (quoting *McFarland*, 127 Wn.2d at 335). Failure to request a limiting instruction may be a legitimate tactical decision not to reemphasize damaging evidence. *Yarbrough*, 151 Wn. App. at 90-91.

Here, Quintana fails to show in the record that trial counsel's decision not to provide a limiting instruction was not tactical. As such, Quintana does not overcome the strong presumption that defendants receive effective assistance. *See Emery*, 174 Wn.2d at 755. Accordingly, we hold that Quintana cannot show he received ineffective assistance of counsel and his claims fail.

### III. APPEARANCE OF FAIRNESS

Quintana argues that the trial court violated the appearance of fairness doctrine when it interrupted Arquette's incriminating statement on the witness stand and when it did not immediately rule on defense counsel's motion to dismiss. Specifically, Quintana argues that the

court's actions violated Quintana's Sixth Amendment due process right to a fair trial and violated the appearance of fairness doctrine. We disagree.

Due process, the appearance of fairness doctrine, and the Code of Judicial Conduct (CJC) require that a judge disqualify himself if he is biased against a party or his impartiality may reasonably be questioned. *State v. Dominguez*, 81 Wn. App. 325, 328, 914 P.2d 141 (1996). "Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). Similarly, Canon 1 of the CJC provides that a judge must comply with the law and must act in a manner that "promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

A defendant claiming an appearance of fairness violation has the burden to provide evidence of a judge's actual or potential bias. *State v. Lundy*, 176 Wn. App. 96, 109, 308 P.3d 755 (2013). Without evidence of actual or potential bias, a claim of judicial bias is without merit. *Dominguez*, 81 Wn. App. at 329. We use an objective test to determine if a judge's impartiality might reasonably be questioned by a reasonable person who knows all the relevant facts. *In re Pers. Restraint of Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010).

Here, Quintana fails to present evidence of actual or potential bias leading to a violation of the appearance of fairness doctrine. Rather, he argues only that the trial court's interruptions of the witness and of defense counsel's motion to dismiss were unfair. These two actions by the trial court, however, are not evidence of judicial bias or the judge having an impermissible

interest in the outcome of the proceeding. As such, we hold that Quintana's appearance of fairness claims are without evidence and without merit.

IV. CONCLUSION

Because there is sufficient evidence to convict Quintana and because Quintana was provided effective assistance from trial counsel, we affirm Quintana's convictions.[3]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J

We concur:

Johanson, J.

Melnick, J.

---

[3] Quintana also asks that we not assess appellate costs. Because he is indigent, we do not assess them. *See State v. Sinclair*, 192 Wn. App. 380, 386, 367 P.3d 612 (2016).